WESTERN STATES CATTLE COMPA-
NY, Tom M. Crowl, Gary D. Dehaan,
and Merritt Brown, Petitioners,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, Respondent.

No. 88–2179.

United States Court of Appeals,
Eighth Circuit.

Submitted March 17, 1989.

Decided July 24, 1989.

David E. Vohs, Sioux City, Iowa, for petitioners.

Maureen Phelen, Washington, D.C., for respondent.

Before BOWMAN, Circuit Judge, and FLOYD R. GIBSON and HEANEY, Senior Circuit Judges.

HEANEY, Senior Circuit Judge.

The petitioners are livestock dealers who have been found by the Department of Agriculture to have fraudulently over-charged their customers in violation of the Packers and Stockyard Act. 7 U.S.C. § 181, *et seq.* (Act). The judicial officer of that Department affirmed the administrative law judge's findings on appeal and suspended the petitioners' registration under the Act. The petitioners were enjoined from dealing in livestock for six months.

We reverse the judicial officer's judgment. Any violations in this case were not substantial and there is insufficient evidence that any violations were willful. Accordingly, we find that the suspensions are not warranted.[1]

---

1. Petitioners have also argued on appeal that the Department of Agriculture judicial hearings are biased in favor of the agency, that the Department violated the Administrative Procedure Act section 558(c) and that their privacy rights were violated by disclosure of their business records to past customers. While we are troubled by the first claim, we are unable on this record to properly evaluate it. We find the other two claims to be without merit.

## I. BACKGROUND

Tom Crowl and Gary Dehaan own and operate Western States Cattle Company of Iowa (Western States). The Packing and Shipyards Office within the Department of Agriculture routinely investigates high volume cattle dealers. Testimony of Keith Kienow, Regional Supervisor, at 16 (Hearing Transcript, April 14, 1986). An investigator from the regional office reviewed Western States' business records in January of 1985. The records revealed that sellers of cattle had occasionally granted Western States a "pencil shrink" of a certain percentage of the cattle's total weight to compensate for lost weight during transport. Western States did not always pass the savings from the shrink on to its customers; they sometimes billed the customers for the cattle's full weight without the shrink allowance.

The form invoices used by Western States described the company as "order-buyers," an ill-defined term that loosely refers to agents who arrange transactions for commissions. Believing that Western States operated solely as agents who bought and sold on commission, the investigator concluded that Western States was possibly defrauding its customers. *Id.* at 17–21. Further investigation was conducted, including interviews with some of Western States' customers. The agency filed an administrative complaint isolating twenty suspicious transactions in 1984 primarily involving three customers, Clarence Kenkel, Francis Kenkel of the Lazy K. Farm, and S.L.S. Farms. The complaint alleged that Western States overcharged their three customers and kept inaccurate records. At the close of hearings, the agency withdrew allegations respecting six transactions. The administrative law judge found that the agency's allegations were substantiated with respect to the remaining fourteen transactions and the judicial officer for the Department of Agriculture affirmed, suspending petitioners' licenses.

## II. DISCUSSION

### A. Standard of Review

In reviewing the judicial officer's decisions, we consider whether there is sub-stantial evidence to support his conclusions, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison v. Labor Board*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *Farrow v. United States Department of Agriculture*, 760 F.2d 211 (8th Cir.1985).

### B. Sufficiency of the Evidence

The judicial officer made three crucial fact determinations. First, the petitioners held themselves out as order-buyers. Second, the petitioners promised to charge a commission of only fifty cents per hundred-weight of cattle. Third, the petitioners overcharged various customers by not passing on to them the savings represented by the shrink allowances.

■ Whether or not the petitioners were acting as order-buyers or as independent dealers who could charge what they want is the crux of the dispute. The record contains the following evidence on this issue.

Both of the Kenkels testified that their first contact with petitioners was in 1979. Clarence Kenkel called Western States with a request to purchase a certain type of cattle. Gary Dehaan located such cattle and accompanied Kenkel to a sale barn. Dehaan negotiated the purchase. Kenkel inspected the cattle and paid the seller directly, trucking the cattle himself. Dehaan was paid a commission of fifty cents per hundredweight. Hearing Transcript at 63, 85 and 428 (testimony of Clarence Kenkel and Gary Dehaan). Clarence Kenkel testified that after the 1979 transaction the terms and conditions of subsequent transactions were not discussed, "and so I assumed that it would stay the same unless I heard different." *Id.* at 63.

No testimony, however, revealed any transactions conducted in a similar manner. For example, three years later, and two years before the transactions in question, Gary Dehaan called Francis and Clarence Kenkel and invited them to the Dunlop livestock auction, where Dehaan had cattle

for sale. The Kenkels bought Dehaan's cattle and trucked the cattle themselves. The Kenkels knew that the cattle they were buying belonged to Western States. *Id.* at 429–30. In addition, Francis Kenkel participated in many transactions with Western States, but his testimony reveals no transaction similar to the first. In subsequent transactions, Western States made all the arrangements and delivered the cattle at a fixed price. In contrast, Francis Kenkel testified that he currently does business with an order-buyer and that the manner of business resembles the first transaction with Western States, namely, that he pays the cow barn directly and that the agent's commission is then paid separately. *Id.* at 125. The Kenkels repeatedly testified that usually Western States would simply quote them a price "laid-in" or "delivered-in" to their farm. *Id.* at 83, 126. They would pay the full amount to Western States rather than writing a check to the original owner and a separate commission check to Western States. *Id.* at 86.

Gale Schafer, of S.L.S. Farms, testified that he purchased cattle from Western States through Merritt Brown. Brown is an experienced buyer who sometimes bought cattle for others at auction and at other times bought for his own account. *Id.* at 475–489 (examination of Merritt Brown). On occasion, Western States advanced funds to Brown to cover his purchases. Western States and Brown then split their profits. *Id.* at 479–484. Schafer testified that Brown offered to buy cattle on commission. *Id.* at 149. Because only three S.L.S. transactions are included in the record, it is not clear if Western States was always involved in transactions between Brown and S.L.S. In fact, Schafer testified that he was at times unaware whether Western States was involved. *Id.* at 152.

Schafer made one damning accusation. Once he recalled accompanying Merritt Brown to a cow barn where the cattle were being weighed. Later, he called the rancher and found out that there was a $4.00 difference between the price at which the cattle were sold and the price he was charged. *Id.* at 156. He stopped doing business with Western States and Merritt Brown at that time. On cross-examination, Schafer admitted, however, that he had made a mistake in assuming that he had been overcharged. Apparently, the cattle had been sold at the lower price to a middle man earlier that day, who had then sold the cattle to Western States.

> I learned later that that was not the case. * * * There was another gentleman there the day that we loaded the cattle that I met that day, and I understand he was the one who bought the cattle, and Merritt bought them from him. I guess that's the way it worked. I didn't realize that the day we were out loading the cattle, though.

*Id.* at 158–59, 167. In addition, he testified that they regularly weighed the cattle themselves at SLS Farms. *Id.* at 166.

There is also other evidence in the record of marginal significance. For example, the form invoice used by Western States, copied from another company, used the term "order-buyer." *Id.* at 427. The official registration, however, listed Western States as a dealer. *Id.* at 170. In addition, we note that Western States was open and cooperative with respect to its records and the investigation. *Id.* at 333 (testimony of investigator).

We do not believe that there is substantial evidence in the record to support the finding that Western States defrauded its customers. After carefully reviewing the record, we conclude that Western States was not acting as an order-buyer and thus was permitted to charge what the market would bear. We base our conclusion on several key points of evidence. First, according to the testimony and the invoices, Western States' customers were billed at a fixed price. Either Tom Crowl or Gary Dehaan would simply quote the purchaser a price for which the cattle could be delivered to their yard. *Id.* at 83 (testimony of Clarence Kenkel). Second, with the exception of the 1979 transaction, the invoicing shows that all cattle were bought and paid for by Western States, who took title in the cattle, before any sales were made to other parties. Western States usually handled the cattle, insured them and trucked them.

*Id.* at 113–14. The only exception was a transaction in 1979 where Western States clearly acted as an agent and was paid separately. Third, Western States regularly made adjustments to its customers, reimbursing its customers for steers that were sick or that died soon after delivery. The petitioner submitted into evidence check drafts for over $26,000 representing adjustments paid to customers who purchased livestock. *Id.* at 436. This is inconsistent, we feel, with the role of an agent. Lastly, Western States conducted well over four hundred transactions a year. Customers never complained about their conduct, and even those customers who weighed the cattle were satisfied that they were receiving a fair weight. Whether or not the shrink would be passed on was a matter of judgment for Western States, since it really was a discount given to them by the seller. They passed the shrink allowance on to their customers when they believed the cattle had shrunk. *Id.* at 434–35.

On the basis of these facts, we do not believe that there was substantial evidence that Western States acted as an order-buyer with respect to any of the fourteen transactions. If Western States is regarded as a dealer, rather than an order-buyer, then they committed no substantial violations of the Act.[2]

### C. Penalty Standards

In light of our foregoing conclusion, the penalty imposed is clearly too severe. While Western States' record-keeping and invoice form may have been improper, there is insufficient evidence that they intentionally defrauded any customer. Mere violation of the Department's regulations is insufficient by itself to establish the intentional or flagrant conduct necessary to justify severe sanctions. *Farrow,* 760 F.2d at 216.

## III. CONCLUSION

Accordingly, we reverse the judicial officer's judgment in part. The suspensions are unwarranted. We let stand the cau-

tionary injunctions with respect to record keeping.

---

**2.** There was one transaction where the weight was incorrectly listed at 330 pounds more than actual weight, but this was likely inadvertent. *Id.* at 327.