**Danny COBB and Crockett Livestock Sales Company, Inc., Petitioners,**

v.

**Clayton YEUTTER, Secretary of Agriculture, Packers and Stockyards Administration, United States Department of Agriculture, Respondents.**

No. 89–3201.

United States Court of Appeals, Sixth Circuit.

Submitted Oct. 3, 1989.

Decided Nov. 14, 1989.

---

**726**

J. Thomas Caldwell, Ripley, Tenn., for petitioners.

Diane Langton, Dept. of Agriculture, Office of the General Counsel, Washington, D.C., for Clayton Yeutter.

Margaret M. Breinholt, Dept. of Agriculture, Office of the General Counsel, Catherine G. O'Sullivan, U.S. Dept. of Justice, Chief Appellate Section, Anti–Trust Div., Washington, D.C., for United States Dept. of Agriculture.

Before KEITH, JONES and GUY, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

In this action, Danny Cobb and his livestock auction marketing facility, Crockett Livestock Sales Company (referred to collectively as Cobb), appeal from a decision of the Secretary of the United States Department of Agriculture. The Secretary filed a complaint asserting that Cobb violated the Packers and Stockyards Act (the Act), 7 U.S.C. § 181, *et seq.*, in a number of ways. An administrative law judge (ALJ) and a reviewing judicial officer both found Cobb to have violated the Act. Cobb now appeals, arguing that there is no substantial evidence supporting the alleged violations, that the sanctions imposed are arbitrary, and that Cobb's constitutionally protected right to due process was violated by the Secretary's utilization of a fundamentally unfair administrative procedure. Finding Cobb's arguments to be without merit, we affirm.

I.

After an investigation conducted in late 1984, the Administrator, Packers and Stockyards Administration, United States Department of Agriculture, filed a complaint on August 23, 1985, charging Cobb with willful violations of the Act and of regulations issued thereunder (9 C.F.R. § 201.1, *et seq.*). This appeal focuses on two alleged violations: Cobb's failure to file and have in effect an adequate bond, as required by 7 U.S.C. § 213 and 9 C.F.R. §§ 201.29, 201.30; and shortfalls in the custodial account Cobb was required to keep on behalf of shippers who consigned livestock to Cobb for sale at auction. 9 C.F.R. § 201.42.[1]

In July 1986, an administrative hearing was held before an ALJ. At this hearing, agency investigators described conversations they had with Cobb in late 1984 and early 1985. During this period, Danny Cobb was conducting business not only through Crockett Livestock Sales Company in Maury City, Tennessee, but also, from August of 1984, Cobb sold livestock from a facility he leased in Scott's Hill, Tennessee. At the time of the investigation, October 1984, Cobb had only a $12,000 bond to

---

**1.** Cobb was also charged with violations of provisions governing the accurate keeping of records. While Cobb was found to have kept inadequate records, and was ordered to henceforth keep accurate, detailed, and conforming records, Cobb does not appeal the decisions relating to this charge.

secure his buying activities.[2] By applying the provisions of 9 C.F.R. § 201.30(b) to Cobb's operations, the investigators determined that Cobb needed clause 2 bond coverage of $50,000. The investigators orally notified Cobb of this requirement on October 8, 1984, and issued written notifications concerning this requirement on October 24, 1984, and January 10, 1985. Between the first notification and April 1, 1985, Cobb continued to operate both facilities, although he never obtained the increased bond coverage. On March 31, 1985, Cobb terminated the Scott's Hill business.

At the hearing, evidence was also presented regarding Cobb's maintenance of the required market custodial account. According to the testimony of agency auditors, on two separate days Cobb's custodial account improperly contained funds that were insufficient to offset the amounts Cobb owed to shippers. While the account was not overdrawn, and there was no evidence that any shipper ever failed to receive money owed by Cobb, the agency auditors noted that federal regulations require strict compliance with the rules for maintenance of a custodial account, and that Cobb's conduct arguably failed to conform to these standards.

Cobb responded by asserting that he committed no violations. He argued that, as soon as the investigators notified him of the bond deficiency, he made every effort to obtain increased bond coverage. When he finally determined he would not be able to get the necessary protection, he shut down the leased operation. As to the custodial account violations, Cobb suggested that the alleged deficiency existed only because the agency auditor failed to consider whether Cobb could have covered the shortfall with money from buyers during the seven-day period following a sale. Cobb argues that such a seven-day grace period is allowed by the regulations. In addition, Cobb emphasized the fact that no consignor ever complained or lost money;

in fact, Cobb argues, such losses were protected against by a letter of credit Cobb possessed, which credit could have been used to cover actual shortfalls, had any developed.

Despite Cobb's arguments, the ALJ found that bond coverage had been inadequate and that Cobb had failed to maintain the custodial account in strict conformity with the governing regulations. The ALJ assessed a $5,000 civil penalty against Danny Cobb and the Crockett Company, jointly and severally, and ordered both suspended as registrants for six weeks. Additionally, the Crockett Livestock Company was ordered not to resume operations until after demonstrating that shortfalls in its custodial account had been remedied.

Cobb promptly filed an administrative appeal from the ALJ's decision. Pursuant to the administrative procedures established by the Department of Agriculture, this appeal was heard by a judicial officer (JO) who had authority to review the ALJ's decision, and to sustain, increase, or decrease the recommended penalty. The JO's decision becomes that of the Secretary. In this instance, the JO affirmed the ALJ's conclusion that Cobb operated with insufficient bond coverage and failed to manage the custodial account properly. The JO sustained the ALJ's sanctions relating to these offenses.

Cobb thereafter filed a timely petition for review of the Secretary's opinion by this court, pursuant to 7 U.S.C. § 194(a). The JO stayed enforcement of its ordered sanctions until after this court's decision on appeal.

## II.

■ Before proceeding to the substantive analysis of Cobb's arguments, we must indicate our standard of review. Although there has been some disagreement among the parties, it is clear to this court that we review the Secretary's decisions as to viola-

---

**2.** The regulations clearly distinguish between two distinct types of bonds and bond requirements. 9 C.F.R. § 201.31. So-called "clause 1" bonding requirements pertain to selling activities, while "clause 2" bonds relate to buying

operations. At all relevant times, Cobb had, in effect, a $60,000 clause 1 bond, which all parties agree was adequate. The charge in the agency's complaint relates only to an alleged deficiency in the clause 2 bond.

tions under a substantial evidence standard. *Parchman v. United States Dep't of Agric.*, 852 F.2d 858 (6th Cir.1988); *Blackfoot Livestock Comm'n Co. v. Department of Agric.*, 810 F.2d 916, 920 (9th Cir.1987); *American Fruit Purveyors, Inc. v. United States*, 630 F.2d 370 (5th Cir.1980), *cert. denied*, 450 U.S. 997, 101 S.Ct. 1701, 68 L.Ed.2d 197 (1981); *Hyatt v. United States*, 276 F.2d 308 (10th Cir.1960). We will thus affirm the Secretary's findings that Cobb operated with an inadequate bond and improperly managed the custodial account if there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). We must affirm so long as substantial evidence supports the Secretary's decision, even though substantial evidence might also support a contrary conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986) (en banc).

### III.

■ Applying the substantial evidence standard of review to the first contested decision—that Cobb operated with inadequate bond coverage—the Secretary's conclusion must be affirmed. The language of 9 C.F.R. § 201.29(a) is very clear: "No market agency or dealer shall conduct his operations unless there is on file and in effect a bond complying with the regulations." In this case, uncontroverted evidence establishes that Cobb operated both the Maury City and Scott's Hill facilities from August 1984 through March 1985 without adequate bond coverage.

Cobb attempts to justify this conduct by saying that he was initially unaware of the increased bond requirements, but when the government notified him, he made every effort to comply. When compliance was found to be impossible, he ceased operations at Scott's Hill.

While these factors suggest that Cobb may not have been intentionally wrongful or deceitful, this conduct nevertheless violated federal regulations. From August 1984 until the federal investigators arrived in October 1984, Cobb knowingly operated two facilities despite the fact that he had only taken out a bond large enough to cover the Maury City operation. After being notified of the need for a $50,000 bond, Cobb continued to operate both facilities for over five months. Rather than shutting down the Scott's Hill facility while he sought increased coverage, Cobb chose to operate both facilities under clearly inadequate protection. Finally, uncontroverted government testimony establishes that part of the increased bond requirement—from $12,000 to $50,000—was due to heightened trading at the Crockett Livestock Sales Company facility in Maury City. Even excluding the operations at the leased facility in Scott's Hill, Cobb knowingly operated his original facility for over five months with inadequate coverage. There is solid, persuasive evidence supporting the Secretary's conclusion.

### IV.

As his second argument on appeal, Cobb maintains that no evidence supports the Secretary's finding that Cobb mismanaged the custodial account. To analyze this issue, it is essential to first understand the statutory and regulatory requirements regarding such accounts. According to 9 C.F.R. § 201.42(b):

> Every market agency engaged in selling livestock on a commission or agency basis shall establish and maintain a separate bank account designated as "Custodial Account for Shippers' Proceeds," or some similar identifying designation, to disclose that the depositor is acting as a fiduciary and that the funds in the account are trust funds.

This account is a trust account in which agencies must deposit—as trust funds—the proceeds generated from sales of consigned livestock.

There are detailed regulations governing the handling of custodial accounts. 9 C.F.R. § 201.42(c). The key to these regulations for our purposes is the distinction created between "proceeds receivable" and

"accounts receivable." A proceed receivable is an amount owed by a buyer to the market agency which is considered part of the custodial account, and which must be deposited directly into the custodial account when paid from buyer to market agency. An account receivable is also an amount owed by certain types of buyers to the market agency, but in the case of an account receivable, the agency must deposit an amount equal to the amount owed it by the account receivable debtor into the custodial account. When the account receivable debtor pays its debt to the market agency, the market agency need not deposit the funds in the custodial account.

According to 9 C.F.R. § 201.42(c), payments must be made to the custodial account at different times, depending upon the type of transaction. If livestock is sold for cash, the money must be deposited within one day of the sale. If livestock is sold to a buyer to whom no credit has been extended, a proceed receivable is created. For seven days following the sale, the amount owed is considered a part of the custodial account, and as soon as the market agency receives actual payment, it must deposit the proceeds in the custodial account. However, if after seven days the debt is not paid, the proceed receivable changes to an account receivable. At this time, the market agency must pay an amount equal to the amount owed into the custodial account, and the agency may then retain the funds when the account receivable debtor extinguishes its obligation. Finally, when the market agency sells to officers, employees, or owners of the agency, or to buyers to whom credit has been extended, the proceed receivable stage lasts only twenty-four hours. If the debt is not paid to the market agency (and then deposited in the custodial account) by the day after the transaction, the account becomes an account receivable and the market agency must itself deposit funds equal to the debt owed it into the custodial account.

According to the testimony of government auditors at trial, on two separate days—August 28, 1984, and September 29, 1984—Crockett Livestock Sales Company had less money in its custodial account than it owed to shippers. In comparing the amount owed shippers to the sum of the amount in the account, the amount deposited but not yet credited, and the amount of proceeds receivable existing on the relevant day, the auditors found deficiencies of approximately $55,000 on each examined day.

Cobb attempted to counter this evidence by suggesting that the window of time examined by the government was too narrow, as the government admittedly did not consider whether the deficiency had been eliminated by seven days after sales were made. Cobb argues that the statute gives him seven days to cover his debts to consignors.

 Cobb's argument evidences a misunderstanding of the federal requirements. The seven-day period exists only for sales made to non-affiliated, non-credit buyers, which create proceeds receivable. There was no need to wait seven days because the auditors *included* the value of all proceeds receivable in the account. The deficiency as of the audit dates existed because Cobb failed to deposit money in the custodial account to cover accounts receivable— amounts owed by affiliated buyers, by credit buyers, and by non-credit buyers who took over seven days to pay. Danny Cobb himself even admitted as much, justifying his account balances by claiming, "I would always have enough in my accounts receivable to take care of any shortage in my custodial account." The regulations clearly require that the amounts on these accounts receivable be deposited by the market agency, with the market agency's own funds, into the custodial account. Cobb did not timely make such deposits.

 While it appears clear that the Secretary's conclusion was supported by substantial evidence, we should also note that this violation involves more than mere "bookkeeping" rules, as Cobb suggests. When selling as a consignee at an auction, a market agency is acting in a fiduciary capacity on behalf of all shippers who have consigned livestock. The regulations thus attempt to ensure that the consignors' in-

terests are protected. When the market agency chooses to sell to a type of buyer who might pose a greater than normal risk of not paying, it is the market agency who must bear the risk of non-payment. When Cobb chose to sell to employees or to extend credit to buyers, but did not pay money into the custodial account, Cobb impermissibly made the consignors the risk-bearers. It is thus irrelevant that, as Cobb frequently points out, no consignors have ever lost money and his custodial account balance never dipped below zero. Cobb violated the statute by forcing the consignors to bear the risk of loss for sales to risky buyers, and the governing federal regulations make clear that such behavior is strictly forbidden.[3]

## V.

■ Cobb also asserts that the penalty imposed in this instance was arbitrary. Cobb notes that the ALJ and JO ordered a six-week suspension, even though only a four-week suspension was initially requested. Cobb claims the Secretary has no coherent suspension policy, but that this six-week suspension is contrary to a trend of four-week suspensions for custodial account violation settings. Finally, Cobb suggests the punishment is too severe for one whose errors were errors of ignorance and misunderstanding, rather than willful misconduct.

■ We do not think the Secretary acted arbitrarily in assessing Cobb's punishment. We first note that the Secretary, acting through a judicial officer, has broad authority in determining the appropriate sanction. *Parchman*, 852 F.2d at 863; *Blackfoot Livestock Comm'n*, 810 F.2d at 922. We review only to ensure that the chosen penalty is "an allowable judgment" under the law and facts. *Butz v. Glover*

*Livestock Comm'n Co.*, 411 U.S. 182, 189, 93 S.Ct. 1455, 1459, 36 L.Ed.2d 142, *reh'g denied*, 412 U.S. 933, 93 S.Ct. 2746, 37 L.Ed.2d 162 (1973); *Blackfoot Livestock Comm'n*, 810 F.2d at 922. Further, it is clear that despite Cobb's protestations of innocent intent, the acts committed are deemed to have been willful, irrespective of evil motive, when the actor intentionally does something that is prohibited. *Butz*, 411 U.S. at 187, 93 S.Ct. at 1458. Here, Cobb intentionally operated with only a $12,000 bond and intentionally chose not to deposit funds equal to accounts receivable. Finally, the apparent trend in recent decisions under the Packers and Stockyards Act is towards increased sanctions. *In re Spencer Livestock Comm'n Co. and Mike Donaldson*, 46 Agric.Dec. 268 (1987), *aff'd*, 841 F.2d 1451 (9th Cir.1988). Given all of these factors, we conclude that the Secretary properly responded to the proof of these violations by imposing the sanctions in question on Cobb.

## VI.

As a final point on appeal, Cobb asserts that the administrative procedure followed by the Department of Agriculture violated Cobb's right to due process. This argument was presented to the JO, who thoroughly considered it and found it meritless. We repeat the basic conclusions of the JO solely to emphasize their propriety.

■ In this circuit, we have held that, based on Supreme Court precedent, one claiming bias in administrative adjudication procedures has a heavy burden to shoulder. In all such settings, the same agency will necessarily serve both as prosecutor and as judge. This, in and of itself, is not enough to make out a due process violation. In *Utica Packing Co. v. Block*, 781 F.2d 71, 77 (6th Cir.1986), we cited *Withrow v. Lar-*

---

**3.** Cobb also attempts to assert that the fact he possessed a letter of credit, which could have been used to pay consignors in the event of loss, militates against a finding of liability. We disagree. First, consignors should not have to be involved in the business of ensuring that their consignees have valid, irrevocable, sufficient letters of credit. Second, custodial accounts receive greatly increased insurance protection of up to $100,000 per individual trustee, and this protection is unavailable if the consignees are protected in any way other than by deposits into the custodial account. A line of credit is not to be considered in determining whether a custodial account is in balance. *Arab Stock Yard, Inc.*, 37 Agric.Dec. 293, *aff'd*, 582 F.2d 39 (5th Cir. 1978).

*kin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975), for the proposition that a claim of administrative bias

> must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

Here, Cobb's claim of bias rests in large part upon a misunderstanding of the role of the judicial officer. Cobb suggests that the JO in the proceedings dictates to the ALJ the sanction that the JO thinks is appropriate, thereby destroying the ALJ's ability to function as an independent adjudicator. This is simply not the case. The JO does not get involved in trial-level proceedings, and he makes no pre-hearing demands as to appropriate sanctions. In fact, the JO, when called on to hear an appeal, assigns great weight to the sanction recommendations of agency officials. *In re Tiemann,* 47 Agric.Dec. —— (1988). While the JO is part of the Department of Agriculture, the agency attempts to insulate the JO and his adjudicative function from the investigative function (performed by the Packers & Stockyards Administration) and the prosecutorial function (performed by the USDA's Office of General Counsel). There is nothing in Cobb's argument that necessarily suggests the JO is biased or improperly accorded both adjudicative and prosecutorial functions.

Finally, as the JO notes, "[i]t has become fairly routine in these types of cases for those respondents lacking a meritorious defense to assail the administrative process, to claim denial of due process, and to cite the judicial officer for bias." *In re Danny Cobb and Crockett Livestock Sales Co.,* P. & S. Docket No. 6587, slip op. at 74 (Feb. 13, 1989). These due process challenges have been consistently rejected by most courts; in fact, this court has recently rejected arguments as to JO bias similar to those made by Cobb. *Parchman,* 852 F.2d at 866; *Garver v. United States,* 846 F.2d 1029, 1030–31 (6th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 63, 102 L.Ed.2d 41 (1988) (holding that mere fact JO may favor harsh penalties does not make sanction invalid unless evidence of bias is addressed). In this case, Cobb produced no evidence to suggest that either the administrative procedure or the specific JO was biased against him, and this due process argument must fail.

The decision of the Secretary is AFFIRMED.