Jeffrey C. FERGUSON, Petitioner,

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.**

No. 89–2079.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 16, 1990.

Decided Aug. 15, 1990.

Gerard D. Eftink, Kansas City, Mo., for petitioner.

Jeffrey Knishkowy, Washington, D.C., for respondent.

Before LAY, Chief Judge, BEAM, Circuit Judge and WOODS,* District Judge.

* The HONORABLE HENRY WOODS, United States District Judge for the Eastern District of

BEAM, Circuit Judge.

In this Packers and Stockyards Act case, *see* 7 U.S.C. §§ 181–229 (1988), Jeffrey C. Ferguson appeals from the judgment of the judicial officer of the United States Department of Agriculture finding that Ferguson engaged in unfair and deceptive trade practices in violation of 7 U.S.C. § 213(a). Specifically, the judicial officer found that Ferguson, a cattle dealer, fraudulently overcharged some of his customers in transactions in which he acted as a market agency, as defined by the Act. The judicial officer entered a cease and desist order, and imposed both a $25,000 civil penalty to be held in abeyance for five years, and a six-month suspension of Ferguson's registration with the Packers and Stockyards Administration. Finding it to be without justification in fact and an abuse of the Secretary's discretion, we reverse the imposition of the suspension.

## I. BACKGROUND

Ferguson, age thirty-five, operates Ferguson Cattle Company in Spirit Lake, Iowa. He is the sole owner of the cattle company, and has been registered as a dealer with the Packers and Stockyards Administration since 1979. Most of Ferguson's customers live in Iowa, where Ferguson maintains his business and a residence, but he spends much of his time buying cattle in Montana and South Dakota. Ferguson at one time maintained a second residence in Montana, and still spends a great deal of time there, where his wife is a student at Montana State University. With the exception of one year, Ferguson's cattle business has been profitable.

For reasons not in the record, the Packers and Stockyards Administration began an investigation of Ferguson in January 1986. Jimmy Arnaiz, a marketing specialist with the Packers and Stockyards Administration, went to Spirit Lake to meet with the Fergusons in early 1986. Ferguson had talked to the Administration about his annual reports, but not about his invoicing or his trade practices. Arnaiz spent two days reviewing Ferguson's records for

1985—purchase invoices, cancelled checks and ledgers. He eventually focused on seventeen transactions involving fourteen customers. Arnaiz said that these transactions were improper because "there was a markup in price plus a commission being charged." Transcript of Hearing at 18. By comparing the invoice price with Ferguson's cancelled checks, Arnaiz calculated, for all seventeen transactions, a difference of $13,896.71 between what Ferguson paid for the cattle and what he sold them for. *In re Ferguson*, P & S Docket No. 6826, slip op. at 5 (March 1, 1989).

As indicated, the purported problem with these transactions, according to the Administration, is that Ferguson allegedly charged both a markup in price and a commission for his services. The invoices did include a markup in price and a separate figure next to the word "commission." Were Ferguson operating as a dealer, the total amount of the profit would not be a problem. Arnaiz testified that he told Ferguson that he could charge whatever the market would bear in a dealer transaction. Transcript of Hearing at 87. But if Ferguson were acting as an agent for his customer, then he could charge only a commission for his services, and not a markup in price. There is, however, apparently no limitation, except that imposed by competition, on the amount of commission an agency may charge.

The Packers and Stockyards Administration argues that because the invoices contained a separate charge for commission, Ferguson was acting as a market agency. As such, his customers would expect to pay only a commission for his services, and not a markup in price. Ferguson claims that he was in fact acting as a dealer in these transactions, and that the commissions were paid to others as a charge for referrals. Ferguson claims that he did not know that his invoicing was incorrect, and that he would otherwise simply have included the third-party commission, and other charges, in the total price for the cattle.

Arkansas, sitting by designation.

At a hearing before an administrative law judge on October 21–22, 1987, the Department of Agriculture called seven of the customers who were allegedly defrauded by Ferguson. They testified that they had over time bought cattle from Ferguson on both a dealer and agency basis, and that, from the invoices in these transactions, they presumed that the invoice price was the price Ferguson had actually paid for the cattle. However, the customers were equivocal about whether Ferguson had been retained by them in advance to act as their agent. Ferguson also testified at length. He said that he understood his position in these sales to be that of a dealer; that the commissions were paid to others, as is common in the cattle business; and that he was unaware that his invoicing was incorrect or misleading.

The A.L.J. found that Ferguson had presented the transactions to his customers as agency transactions in which Ferguson would charge only a commission for his services, and that, because the invoices itemized a separate charge for commission, Ferguson was acting as a market-agency. The A.L.J. further found that Ferguson's claims were not sufficiently supported by the record, and that Ferguson engaged, deliberately and calculatingly, in unfair trade practices. The A.L.J. entered an order requiring that Ferguson cease and desist from similar violations of the Act, assessing a $25,000 penalty to be held in abeyance for five years, and imposing a six-month suspension. Ferguson appealed to the judicial officer of the Department of Agriculture,[1] who found, at great length, that the A.L.J.'s findings were supported by the record and that the penalties imposed were necessary to enforce the Act. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

Because Ferguson does not challenge the judicial officer's findings that he violated the Act, we do not consider whether there is substantial evidence to support this particular conclusion. *Western States Cattle Co. v. United States Dep't of Agric.*, 880 F.2d 88, 89 (8th Cir.1989). We review only the sanctions, governed by the standard set forth by the Supreme Court in *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973). In *Glover Livestock*, the Supreme Court reversed a decision of this court that had upheld a cease and desist order based upon a weighing violation, but had reversed a twenty-day suspension, imposed pursuant to 7 U.S.C. § 204. *See Glover Livestock Comm'n Co. v. Hardin*, 454 F.2d 109 (8th Cir.1972), *rev'd, Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973). This court held that, given cases cited by the Department of Agriculture,[2] such a suspension was appropriate only if the violation were intentional and flagrant. *Glover Livestock*, 454 F.2d at 114–15. This court further held that because defendant's conduct was not shown to be deliberate or flagrant, the suspension was unconscionable. *Id.* at 114.

The Supreme Court reversed, finding that nothing in 7 U.S.C. § 204, which authorizes suspensions, limits the imposition of a suspension to cases of intentional and flagrant conduct. "[T]he Court of Appeals may have been in error in acting on the

---

1. A party has a right to appeal the decision of the A.L.J. to the judicial officer within thirty days. Absent appeal to the judicial officer, a party cannot appeal to the circuit courts of appeals because the A.L.J.'s decision is not final. 7 C.F.R. § 1.142(c) (1988). *See generally* Campbell, *The Packers and Stockyards Act Regulatory Program,* in 1 J. Davidson, Agricultural Law §§ 3.24, at 212–14; 3.31, at 223–24 (1981). The position of judicial officer was created by the Department of Agriculture to make the Department's final decisions in administrative actions. *Id.* § 3.14, at 199–200. Donald Campbell has been the judicial officer since 1971.

2. The judicial officer, in an academic discussion of *Glover Livestock,* criticizes the Eighth Circuit for its reliance on those cases. "The Court of Appeals apparently thought that there were only four prior department precedents relating to false weighing, whereas more severe sanctions ... had previously been imposed in more than 100 false weighing cases." Campbell, *supra* note 1, § 3.30, at 218. The judicial officer fails to note that those were the cases cited to the court by the Department of Agriculture. *Glover Livestock,* 454 F.2d at 114.

premise that the Secretary's practice was to impose suspensions only in cases of 'intentional and flagrant conduct.'" *Glover Livestock*, 411 U.S. at 187, 93 S.Ct. at 1458. The Supreme Court set forth the appropriate standard for reviewing sanctions as follows: "The court may decide only whether, under the pertinent statute and relevant facts, the Secretary made 'an allowable judgment in [his] choice of the remedy.'" *Id.* 411 U.S. at 189, 93 S.Ct. at 1459 (quoting *Jacob Siegel Co. v. Federal Trade Comm'n*, 327 U.S. 608, 612, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946)).

Since that decision in 1973, we have twice reversed suspensions imposed for violations of the Packers and Stockyards Act. In *Farrow v. United States Dep't of Agric.*, 760 F.2d 211 (8th Cir.1985), the judicial officer found that an agreement between two cattle buyers not to compete against each other at a local market constituted an unfair and deceptive practice under 7 U.S.C. § 213(a).[3] *Id.* at 213. The judicial officer issued a cease and desist order and suspended the buyers for forty-five days, an action that they claimed would bankrupt them. *Id.* at 213, 216. This court reversed the suspension, holding that it was unwarranted and in violation of the Department of Agriculture's own policy. That is, the judicial officer's decision "indicates that under Department policy the admittedly severe order is predicated on the violation being flagrant and serious." *Id.* at 216. Because this court concluded that the evidence did not establish that the buyers "must have known their agreement was unlawful," *id.*, we held that the suspension was improper.

We also reversed a suspension in *Western States*. The judicial officer found that Western States Cattle Company had engaged in unfair and deceptive practices by failing to pass on to its buyers shrink allowances. *Western States*, 880 F.2d at 89. The judicial officer suspended Western States for six months, *id.* at 88, and we reversed. Given a lack of evidence that Western States had intentionally defrauded its customers, and given that there was arguably no violation of the Packers and Stockyards Act, we held that the six-month suspension was too severe. *Id.* at 91.

■ The judicial officer disagrees with *Farrow*. He chooses instead to follow his severe sanction policy, first announced in 1971 and explained at great length since. *See* Campbell, *supra* note 1, § 3.30, at 217–23. Following the Supreme Court's decision in *Glover Livestock*, the judicial officer's writings, both case decisions and otherwise, suggest that he believes that his imposition of a suspension is not reviewable. "The department's severe sanction policy has been consistently sustained on appeal, no doubt as a result of the decision by the Supreme Court in *Butz v. Glover Livestock Commission Co.*"[4] *Id.* at 218. (footnotes omitted). Following our decision in *Farrow*, the judicial officer has written that our "error" in that case is "self-evident," *In re Spencer*, 46 Agric.Dec. 268, 458 (1987), *aff'd*, *Spencer Livestock Comm'n v. United States Dep't of Agric.*, 841 F.2d 1451 (9th Cir.1988),[5] and that our decision violated *Glover Livestock*. Thus, although the Department of Agriculture did not apply for a writ of certiorari in *Farrow*, the judicial officer has announced that he will not follow it, even in the Eighth Circuit. *See In re Upton*, 44 Agric. Dec. 1936, 1959 n. 14 (1985).

The judicial officer, however, is not merely dissatisfied with the Eighth Circuit. He

---

**3.** In *Farrow*, the A.L.J. concluded that no violation had been shown, and dismissed the complaint. *Farrow*, 760 F.2d at 213.

**4.** The Ninth Circuit has commented on the judicial officer's claim that his severe sanction policy has been consistently sustained. In *Spencer Livestock Comm'n v. United States Dep't of Agric.*, 841 F.2d 1451 (9th Cir.1988), the Ninth Circuit followed a citation to several cases with this comment: "The JO routinely makes reference to the cases cited above as a [sic] sustain-

ing of the severe sanction policy.... While it is true we have upheld the Department's choice of sanction in these cases, we have never expressly 'sustained' the severe sanction policy." *Id.* at 1456 n. 3.

**5.** The judicial officer's decision in *In re Spencer*, together with appendix, runs several hundred pages. This is not an uncommon length for a decision by the judicial officer.

seems astonished that *any* court would review his determinations under the Packers and Stockyards Act.

> When I originally wrote the Department's sanction policy, which was expressed in terms of imposing "severe sanctions for serious violations of any of the regulatory programs administered by the Department" ..., it never occurred to me that a reviewing court, which reviews, at most, only a few Packers and Stockyards Act cases in a lifetime, would substitute its judgment for that of the Administrator of the Packers and Stockyards Administration, who has about 40 years' experience in the livestock marketing field, and the Judicial Officer, who has 33 years' experience under the Packers and Stockyards Act ..., as to what constitutes a serious violation under the Act.

*In re Spencer*, 46 Agric.Dec. at 460–61 (citations omitted). In accordance with this view, the judicial officer has rewritten his severe sanction policy to "eliminate the basis for the court's holding" in *Farrow*, Campbell, *supra* note 1, § 3.30, at 218 n. 180 (Supp.1989), and to make our decision in *Farrow* "moot." *In re Spencer*, 44 Agric.Dec. at 462. The severe sanction policy has been rewritten as follows:

> [I]t is the policy of the Department in this case, and hereafter, to impose "severe" sanctions in the case of violations that are, in fact (i.e. according to the reviewing court), neither "serious," flagrant, repeated, nor intentional, so long as the administrative officials and the Judicial Officer (erroneously, according to the reviewing court) determine that the violations are either serious, or flagrant, or repeated.

*Id.* at 462. By this effort, the judicial officer apparently believes that his decisions on sanctions are not reviewable, and that this is consistent with the Supreme Court's decision in *Glover Livestock*.

This is, of course, nonsense. Disregarding the judicial officer's complete disregard for the circuit courts of appeals, the Supreme Court's decision in *Glover Livestock* does not hold that the judicial officer's imposition of sanctions is unreviewable. The Supreme Court's opinion is admittedly deferential to federal agencies, noting that "where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarly a matter for administrative competence.'" *Glover Livestock*, 411 U.S. at 185, 93 S.Ct. at 1457 (quoting *American Power Co. v. Securities and Exchange Comm'n*, 329 U.S. 90, 112 (1946)). But we need not elevate this deference to a conclusion that the judicial officer's imposition of sanctions are not reviewable. In *Glover Livestock*, the Supreme Court held that the Eighth Circuit erred only with regard to the facts. "We cannot agree that the Secretary's action can be faulted in either respect *on this record.*" *Id.* at 186, 93 S.Ct. at 1458 (emphasis added). The Supreme Court did not say that this court erred because we could never review a sanction. We erred because the Supreme Court could not "perceive any basis *on this record* for a conclusion that the suspension of respondent was so 'without justification in fact' 'as to constitute an abuse of [the Secretary's] discretion.'" *Id.* at 188, 93 S.Ct. at 1459 (citing *American Power Co. v. Securities and Exchange Comm'n*, 329 U.S. 90, 115, 67 S.Ct. 133, 147, 91 L.Ed. 103 (1946); *Moog Indus., Inc. v. Federal Trade Comm'n*, 355 U.S. 411, 414, 78 S.Ct. 377, 380, 2 L.Ed.2d 370 (1958); *Barsky v. Board of Regents*, 347 U.S. 442, 455, 74 S.Ct. 650, 657, 98 L.Ed. 829 (1954)) (emphasis added). The Court explained that the judicial officer had based his suspension on the defendant's disregard for previous warnings, and that this circuit had sustained his findings as based on ample evidence. *Id.* The Court concluded: "*In that circumstance,* the overturning of the suspension authorized by the statute was an impermissible intrusion into the administrative domain." *Id.* (emphasis added).

We think that *Glover Livestock* holds that, while the judicial officer can fashion "an appropriate and reasonable remedy," *id.*, whether the remedy is appropriate and reasonable, i.e., an "allowable judgment," will depend on "the pertinent statute and

relevant facts." *Id.* 411 U.S. at 189, 93 S.Ct. at 1459. We must still consider whether "the suspension of respondent was so 'without justification in fact' 'as to constitute an abuse of [the Secretary's] discretion.'" *Id.* at 188, 93 S.Ct. at 1459. *Accord Spencer Livestock Comm'n v. United States Dep't of Agric.*, 841 F.2d 1451, 1456 (9th Cir.1988) (court can overturn sanction where it is "unwarranted in law or unjustified in fact," citing *Glover Livestock*); *Bosma v. United States Dep't of Agric.*, 754 F.2d 804, 810 (9th Cir.1984) (same); *Cobb v. Yeutter*, 889 F.2d 724, 730 (6th Cir.1989) (court reviews sanctions to determine whether a chosen penalty is an allowable judgment "under the law and facts," citing *Glover Livestock*). We can find no decision in which a court has refused to review the judicial officer's choice of sanction because of *Glover Livestock*. Clearly, we will continue to review, case by case, and consistent with *Glover Livestock*, decisions of the judicial officer imposing sanctions.[6]

### B. Justification in Fact

Because Ferguson does not challenge on appeal the findings of the judicial officer, we do not reverse the conclusion that Ferguson violated the Act. Had Ferguson challenged it, we very likely would have reversed the finding that Ferguson acted as a market agency. There is very little probative evidence to that effect. Regardless of whether Ferguson was acting as a market agency, however, we conclude that the six-month suspension is too severe.

The judicial officer found that Ferguson had violated 7 U.S.C. § 213(a) because his billing practices constituted an "unfair ... or deceptive practice." Specifically, the judicial officer found that Ferguson was not acting as a dealer in the transactions at issue, and that, therefore, he could not charge both a dealer markup and a commission. The finding that Ferguson was not acting as a dealer is based on the judicial officer's contention that the mere placing of the word "commission" on the invoice insured that Ferguson acted not as a dealer, but as a market agency. In the words of the A.L.J.'s finding, Ferguson "undertook to supply his customers with cattle for which he charged a commission. By statutory definition, he thereby became a 'market agency.'"[7] *In re Ferguson*, slip op. at 8. Or, as the judicial officer put it: "Under the controlling definitions set forth in the Act, a person subject to the Act who buys or sells livestock is either a market agency or a dealer—a market agency if ... he charges a commission, a dealer if he does not." *Id.* at 17. Separately itemizing a commission, which Ferguson claims was paid to others, made him, according to the judicial officer, a market agency.

 We think this analysis is flawed. Simply citing the statutory definition of market agency does not prove whether Ferguson acted as a market agency in these sales. That a market agency is any person who buys and sells "on a commission basis," 7 U.S.C. § 201(c)(1), does not mean that the appearance of the word "commission" on an invoice is the equivalent of selling "on a commission basis." The definition merely raises the question to be answered: was Ferguson, in fact, selling to his customers in these transactions on a commission basis? The testimony of D'Agostino, the Department of Agriculture's own expert witness on sanctions, reflects the error in the judicial officer's analysis. When asked whether Ferguson had violated the Act in a particular transaction, D'Agostino pointed out the distinction between being an agency in fact, and mere-

---

**6.** As the Ninth Circuit stated in *Spencer:* "We will continue to review decisions of the JO case by case. Where a severe sanction is warranted, it will be upheld, but where it is excessive we will reverse. That we may affirm severe sanctions in a given case reflects our judgment solely as to the facts of that case, and ought not to be construed as a blanket approval of severe sanctions in general." *Spencer,* 841 F.2d at 1456 n. 3.

**7.** The Act defines both "market agency" and "dealer." "The term 'market agency' means any person engaged in the business of (1) buying or selling in commerce livestock on a commission basis." 7 U.S.C. § 201(c). "The term 'dealer' means any person, not a market agency, engaged in the business of buying or selling in commerce livestock." *Id.* § 201(d).

ly writing the word "commission" on the invoice.

Q: Now, that is the invoice to Mr. Elser. Would there be any violation if Jeff Ferguson sold cattle to John Elser and on that invoice he only put down one thing, and that is $33,643?

A: And that's all, no price, nothing else?

Q: That's all. Just the dollar amount, the bottom line.

A: I guess I—I couldn't say for sure whether there would be a violation or not, *because I wouldn't know what the nature of the agreement was between Mr. Ferguson and Mr. Elser.*

Transcript of Hearing at 353 (emphasis added). Whatever Ferguson's invoicing policies, we think that Ferguson was or was not a dealer as a result of the facts surrounding the transaction. As D'Agostino's testimony suggests, we should look beyond the invoice, and inquire about the nature of the business relationship.

■ This fact-based inquiry, left open to us by *Glover Livestock,* points up the distinction between a dealer who maladroitly states the calculation of his profit margin, and one who, acting as a market agency, fraudulently overcharges his principal. That Ferguson wrote the word "commission" on the invoice does not mean that either he or his customers understood that Ferguson was acting as a market agency. Thus, while Ferguson's invoicing may be a violation of the act,[8] if unintentional, the violation should not warrant the same sanction as if Ferguson had deliberately misled his principal. Granted, the Supreme Court said in *Glover Livestock* that nothing in 7 U.S.C. § 204 authorizing suspensions "confines its application to cases of 'intentional and flagrant conduct.' " *Glover Livestock,* 411 U.S. at 187, 93 S.Ct. at 1458. But to say that a violation need not be intentional to warrant a suspension is not to say that all unintentional violations should be punished with a suspension. And *Glover Live-*

stock certainly does not say that intention is irrelevant as to whether a suspension is for six days, six months or six years. Thus, the distinction between intentional and unintentional conduct is absolutely relevant to the severity of the sanction.

■ We must, therefore, examine the record to determine whether Ferguson was in fact acting as a market-agency, and whether he deliberately led his customers to believe that the only fee he was charging them was a commission. The A.L.J. made two relevant findings of fact. The A.L.J. found that Ferguson "purchased livestock for various customers on a commission basis and led them to believe that his invoices to them consisted of the actual purchase prices plus the agreed buying commissions." *In re Ferguson,* slip op. at 3. The A.L.J. also found that Ferguson's customers testified that "the transactions were presented to them as agency transactions in which respondent's only profit was to be the agreed commission." *Id.* at 5. These findings suggest that Ferguson and his customers had agreed that Ferguson would act as their agent. Based on these findings, the judicial officer was able to refer to "the testimony of complainant's witnesses that respondent told them he was charging them a commission in the transactions." *Id.* at 24. We think that these findings overstate and mischaracterize the evidence. To the contrary, we think that the evidence falls far short of proving, even under a preponderance standard, that Ferguson "told [his customers] he was charging them a commission in the transactions."

None of Ferguson's customers who appeared at the hearing testified that Ferguson said any such thing. Jack Montgomery testified that he had transacted both dealer and agency sales with Ferguson, transcript of hearing at 98, but he was not specific about their agreement in the particular transaction presented at trial. In-

---

**8.** Because Ferguson does not challenge the findings of the judicial officer that he violated the Act, we do not decide whether his invoicing would violate the Act if he were in fact a dealer. While Ferguson admits that his invoices may have been misleading, it is unclear whether that alone violates 7 U.S.C. § 213(a). We consider only whether the sanctions in this case are justified in fact.

stead, Montgomery merely related that the transactions were arranged either way.

Q: Well, Jeff would describe the quality of cattle he had for sale and what the price was and what he thought he could procure them for, and I would either agree or disagree.

Q: Did you have the—did he have the cattle at that time? He had it bought or he had seen the cattle out in the field?

A: I would—I would assume could be either case. I mean, some cases he would check the cattle. Some cases he would have the cattle.

*Id.* at 100. Montgomery's only testimony specific to the transaction at issue was that, from the invoice, he would expect that Ferguson's only fee was a commission, and that the invoice price was what Ferguson paid. *Id.* at 101. But as to the nature of the particular transaction, Montgomery was ambiguous. When asked whether he would have preferred to buy the cattle at the same price Ferguson paid for them, Montgomery answered: "If it was an agency transaction, yes." *Id.* When asked directly whether Ferguson had made a "direct representation to you that that's all he was getting," i.e., a commission, Montgomery replied: "Like I said, it was either a net or dealer transaction to me or it was an agent or commission, and that's the way I understood it." *Id.* at 107. Montgomery simply did not testify, in the judicial officer's characterization, that Ferguson "told [him] that he was charging [him] a commission."

Larry Graham testified that he had been involved in both types of transactions with Ferguson, *id.* at 112, and that in the transaction in question, he did not "recall whether I called Jeff or whether Jeff had called me, but I told him the weight range I wanted on cattle and price that I wanted to buy them for." *Id.* at 110. Graham's testimony, however, does not indicate whether Ferguson eventually sold him cattle Ferguson already owned. Indeed, Graham's testimony indicates that he concluded that the transaction in question was an agency transaction only because of the invoice, *id.* at 114, and not because Ferguson had told him so.

Paul Harrington explained his dealings with Ferguson as follows:

Q: Okay. And would he quote you a straight price that the cattle were to be, or did he—did you give him a top limit to obtain the cattle, plus—did he mention a commission?

A: It just depended on the cattle. It varied.

*Id.* at 120. When asked whether he remembered the particular transaction in question, Harrington said he did not. *Id.* at 121.

John Elser also testified that he had done both types of transactions with Ferguson, *id.* at 137, but that he couldn't remember the particular transaction involved. *Id.* at 139.

Q: Now, do I understand it that you said that you didn't remember the specific terms of these transactions?

A: No, I don't really. It's too many.

Q: You don't recall who called who and who said what to who?

A: No, not on these specific ones.

*Id.* at 142. Elser could testify only that, after the fact, looking at the invoice, he would think that the transaction was an agency one. But he also testified that he probably knew that Ferguson had purchased the cattle five or six days before he sold them to Elser.

Q: Did you realize that most of the cattle had been bought five or six days before that by Jeff in South Dakota?

A: I know at times he had bought cattle at an auction, and he had a yard up north of Lake Park. Sometimes he would drop them off there and try to sell them to me later.

Q: And it appears, doesn't it, that this— in this transaction some of the cattle were owned by Jeff for five days and other cattle for six days prior to the time you bought them?

A: I probably didn't know the exact dates, but I probably knew he had them.

*Id.* at 144–45.

Warren Feldick testified that he, too, had done both types of transactions with Fer-

guson and that their agreements were pretty loose.

Q: Did he also ever offer to purchase cattle on your behalf in which he would charge a commission?

A: When we first started, there was— there was related to that and yet the affidavit that I signed here, there is a little question that I said he should buy under those conditions with the commission, but it's a little misleading, because if that would change, I would tell him, "Okay. If you need more, you have to," because there are—sometimes there's other buyers—when they have to travel a long ways, there could be extra commissions there; so I've got an open mind to that.

*Id.* at 175–76. Feldick's testimony also confirmed Ferguson's claim that the commission listed on the invoice was paid to someone else. Feldick said that, because the separate commission on the invoice confused him, he checked into it.

I also made a call myself to one of my buyers, one I haven't seen him since, and I think it was because he offered that—I got my name—that he gave my name to Jeff and—which is a lot of time a practice that they demand—when you give somebody else a name, they should have a little piece of the pie.

*Id.* at 179–80. In no way did Feldick indicate that Ferguson had intentionally misled him.

Indeed, nothing in the record indicates that the Packers and Stockyards Administration undertook its investigation of Ferguson because of complaints from his customers. At trial, Ferguson's customers all said they were pleased with the quality of Ferguson's cattle, and, of those asked, most were still doing business with him. Contrary to the findings of the A.L.J. and the characterizations of the judicial officer, we think that the testimony of Ferguson's customers failed to prove that Ferguson intentionally misled his customers. The only fair conclusion to be drawn from the

testimony is that, after the fact, when the customers looked at the invoice, they thought that it indicated an agency transaction. This proves only that the invoice was misleading. It most decidedly does not prove that Ferguson's actions "resulted ... from his deliberate and calculating effort to obtain every business advantage." *In re Ferguson,* slip op. at 10.

Moreover, several other facts in the record support Ferguson's claim that he acted as a dealer in these transactions. First, Ferguson claims that he held title to the cattle before he sold them—that he bought them as a dealer, and then sought a buyer. He did not buy them for sale to a specific customer. The only evidence in the record on title came from Ferguson, and was not mentioned by the A.L.J. or the judicial officer. Ferguson testified, for example, that he purchased the cattle he sold to Harold Christensen at an auction in Miller, South Dakota, without any direction from Christensen. Only after the purchase did Ferguson contact Christensen, and when the cattle were delivered, Christensen thought he had purchased the steers cheap. Transcript of Hearing at 260. Ferguson also testified that he sold cattle to Hummel Farms in Spirit Lake that had been purchased on separate occasions in Iowa and in South Dakota. *Id.* at 261. The invoice for sale to Hummel Farms is dated April 29, 1985, complainant's exhibit 7, at 8, while Ferguson wrote the checks for their purchase on April 23, 25 and 29. *Id.* at 5, 7, 3. Similarly, cattle sold to Larry Graham on May 9 were paid for on May 8 and 9. Complainant's Exhibit 9, at 4, 6. Moreover, of the cattle bought on the 9th, only some were sold to Graham. *Id.* at 6–8. Ferguson testified that while he knew Graham was looking for cattle, he called him only after he purchased the cattle. And, in the sale to John Elser on May 20, 1985, Ferguson took title to the cattle on May 14. Complainant's Exhibit 11, at 3, 5. *See also* Transcript of Hearing at 263–64.[9]

9. While the A.L.J. apparently disbelieved much of Ferguson's testimony, a fact upon which the judicial officer laid great weight, *In re Ferguson,* slip op. at 13, the dates on which Ferguson

purchased cattle and on which he sold them are facts not subject to a credibility determination. We need not defer to the A.L.J.'s factfinding under the guise of credibility when the A.L.J.

Second, Ferguson made several adjustments in the price of the cattle, which he arguably would not have done, and would not have been required to do, were he acting as a market-agency. Paul Harrington testified that Ferguson reduced the price on an order of cattle when he was not happy with the quality. Transcript of Hearing at 123–24. Floyd Swanson testified that Ferguson gave him a discount on an order of heifers that were larger than Swanson wanted. *Id.* at 162. Warren Feldick testified that when a steer died during a snowstorm while being trucked to his farm, Ferguson stood the loss on the steer. *Id.* at 189–90. And Ferguson testified that he made an adjustment on cattle sold to Dean Hummel. *Id.* at 261.

Finally, the record is silent as to why the Packers and Stockyards Administration audited Ferguson. As indicated, Ferguson's customers apparently did not complain about these transactions. Indeed, as we have also indicated, all who testified said that they were pleased and satisfied with the quality of cattle they got from Ferguson. Those who were asked indicated that they had not quit buying from Ferguson because of the complaint filed by the Packers and Stockyards Administration. *Id.* at 102 (Jack Montgomery; got "excellent cattle"; had not bought that fall, but had last year); *id.* at 114–15 (Larry Graham); *id.* at 122–23 (Paul Harrington; got "quality cattle"); *id.* at 140–41 (John Elser); *id.* at 150–51 (Ron Johannesen); *id.* at 161 (Floyd Swanson; satisfied with cattle; no longer buying from Ferguson because no longer feeding cattle); *id.* at 185–86 (Norman Feldick; happy with quality; would buy from Ferguson in the future).

We think this testimony is significant. Many of the customers testified that they closely monitored cattle prices. Larry Graham testified that at the time of the purchase in question, he checked cattle prices two or three times a day. *Id.* at 116–17. Jack Montgomery said that he followed cattle prices daily through the Wall Street Journal and the Des Moines Register. *Id.* at 104–05. These were sophisticated cattle buyers, yet apparently none complained. Were Ferguson's actions as flagrant and serious as the judicial officer suggests, we are hard-pressed to understand how these seasoned cattle buyers could think they had purchased the cattle at a fair price.

While none of these factors is conclusive, and while together they do not prove that Ferguson's invoicing in these transactions was not misleading, we think that all are solid evidence that the six-month suspension is too severe. In *Western States*, we considered the same factors: the invoices showed that Western States had bought and paid for all the cattle, thus taking title; Western States made adjustment to its customers, an act "inconsistent ... with the role of an agent;" and Western States' customers never complained. *Western States*, 880 F.2d at 90–91. Thus, this court found that there was not substantial evidence that Western States acted as a market-agency, and thus that "the penalty imposed is clearly too severe." *Id.* at 91.[10]

Our conclusion is not based upon but is strengthened by the fact that the six-month suspension would likely put Ferguson out of business. Ferguson testified that his monthly debt obligations are heavy, transcript of hearing at 280–85, that his wife is in school, *id.* at 287–88, and that he could not meet his monthly obligations under a six-month suspension. *Id.* at 288, 371. When asked whether he could resume his cattle operations after the suspension, Ferguson replied that he would not. *Id.* at 373. On the facts of this case, we see no

---

has simply ignored facts which have nothing to do with credibility.

**10.** The Department of Agriculture contends on appeal that *Western States* is distinguishable from this case. We note only that at trial, the Department's expert witness on sanctions, D'Agostino, testified that he thought *Western States* was similar to Ferguson's case. D'Agosti-

no testified that the six-month suspension for Ferguson was similar to that imposed in other like cases, particularly *Western States*, in which a six-month suspension was given. Transcript of Hearing at 344–45. D'Agostino testified, of course, prior to this court's reversal of the six-month suspension.

reason to put Ferguson out of business.[11]

## III. CONCLUSION

Whatever the judicial officer's commitment to imposing severe sanctions without regard for facts and to disregarding Eighth Circuit decisions, this court remains dedicated to the fair enforcement of the Packers and Stockyards Act. To that end, we will continue to review, case by case, and consistent with *Glover Livestock*, sanctions imposed by the judicial officer. Given the equivocal testimony of the farmers who bought cattle from Ferguson, the absence of evidence that Ferguson deliberately represented to them that he was acting as their agent in these transactions, the evidence that Ferguson took title to the cattle and made adjustments, and the fact that Ferguson's customers apparently did not complain, we hold that the six-month suspension imposed in this case is too severe. It is " 'so without justification in fact' 'as to constitute an abuse of [the Secretary's] discretion.' " *Glover Livestock*, 411 U.S. at 188, 93 S.Ct. at 1459. Accordingly, we reverse the judgment of the judicial officer as to the six-month suspension. We let stand the cease and desist order and the civil penalty which is to be held in abeyance for five years.

LAY, Chief Judge, Concurring Specially.

I concur in the judgment of reversal.

11. In an example of perverse reasoning, the A.L.J. acknowledged that the suspension would put Ferguson out of business but noted that, given Ferguson's low income from the business, a six-month suspension was not lengthy: "[A]ccording to respondent's tax returns, he has never earned more than $5000 a month from his business and the suspension would therefore cost him at most $30,000." *In re Ferguson*, slip op. at 10.