Jackie **MOORE, individually and as the operator of Joplin Regional Stockyards; Joplin Regional Stockyards, Inc., a Missouri Corporation, Plaintiffs–Appellants,**

v.

Edward **MADIGAN, Secretary of the United States Department of Agriculture, and the United States, Defendants–Appellees.**

No. 92–2272.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1993.

Decided April 1, 1993.

Rehearing Denied May 5, 1993.

Gerard D. Eftink (argued), Kansas City, MO, for plaintiffs-appellants.

Alleen S. Castellani (argued), Kansas City, MO, for defendants-appellees.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge, FLOYD R. GIBSON and REAVLEY,* Senior Circuit Judges.

REAVLEY, Circuit Judge (sitting by designation).

The Animal and Plant Health Inspection Service of the United States Department of Agriculture (USDA) suspended the "specifically-approved stockyard status" (SASS) of Joplin Regional Stockyards, Inc. (JRS). USDA reached its decision after conducting an informal hearing at which a hearing officer found that various people repeatedly violated USDA's brucellosis regulations on JRS's premises. JRS and its legally-responsible operator, Jackie Moore, sued USDA for declaratory and injunctive relief. On cross-motions for summary judgment, the district court held that USDA's governing statute and regulations permitted the informal hearing procedure that USDA adopted for this case and that USDA accorded Moore a pre-sanction opportunity to correct violations. But the court also held that the facts of this case did not justify the penalty selected by USDA, and accordingly reduced JRS's suspension period from five years to six months. Only Moore appeals. We affirm.

## I. BACKGROUND

Moore and his family formed JRS in 1986, and JRS purchased Missouri real estate that had long been used as a stockyard (the stockyard). JRS earns money for each animal traded at the stockyard. Four livestock commission companies broker sales at the stockyard for additional fees, but only Joplin Livestock Commission Company (JLCC) is owned by Moore and his family. The three other companies lease space from JRS.

JRS can facilitate trade in Missouri cattle without federal permission. But to attract trade in out-of-state animals, JRS must secure SASS from USDA. *See* 9 C.F.R. §§ 78.5, 78.9–.12. USDA grants SASS to stockyards that agree to participate in

* The HONORABLE THOMAS M. REAVLEY, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

USDA's program to eradicate brucellosis. Brucellosis is an infectious disease that inhibits both procreation and milk production in cattle. USDA classifies states according to the incidence of brucellosis that USDA detects in each state. This case concerns activities during 1988 and 1989, when USDA classified Missouri as an "A" state and Oklahoma as a "B" state.

To combat brucellosis, USDA requires stockyard operators to 1) maintain sanitary conditions and 2) identify and separate cattle according to the brucellosis classification of the state from which the cattle arrive for sale.[1] USDA only grants SASS to stockyards that designate an individual as "operator" to be legally responsible for the fulfillment of these requirements. *See id.* § 78.44. Jackie Moore executed a SASS agreement (the Agreement) with USDA in February 1987.

On October 13, 1988, Dr. Charles Dake, a district veterinarian for the Missouri Department of Agriculture who USDA charged with inspecting stockyards for compliance with USDA regulations, found that the stockyard did not meet USDA sanitation requirements and that "numerous Oklahoma [class B] cattle shipments have been run through this market as class A animals." Dake warned in his report that "this is a serious problem which is a direct challenge to Missouri's class A status," and delivered this report to Raymond McDowell, a JRS manager. On at least three occasions before this adverse inspection report, JLCC sold class B Oklahoma cattle as class A Missouri animals. Dr. Stephen Short, who tested animals for brucellosis at the stockyards, testified that class A animals usually bring a higher price than class B animals.

On May 18, 1989, USDA inspector Walter Waddell toured the stockyards and again found sanitation and identification violations. In September 1989, USDA sent Moore a letter alleging the sanitation and identification infractions as breaches of the Agreement and proposing to withdraw the stockyard's SASS. Moore denied the allegations and requested a hearing. USDA provided an informal hearing, which Moore challenged as inadequate under USDA regulations.

After considering testimony and exhibits from Moore and USDA, a USDA hearing officer found that Moore breached the Agreement because 1) the stockyards did not meet USDA's sanitation standards and 2) on ten occasions (eight before October 13, 1988 and two more before May 18, 1989), class B cattle were sold as class A animals at the stockyard. A USDA deputy administrator recited these findings and ordered that SASS be removed from JRS and affiliated individuals and companies for five years. Moore and JRS exercised their statutory right to sue USDA for declaratory and injunctive relief from this order, *see* 5 U.S.C. §§ 702–03, and USDA stayed its order pending outcome of this litigation.

On cross-motions for summary judgment, the district court held, *inter alia,* that 1) the informal hearing granted Moore by USDA did not contravene USDA's governing statute or regulations and 2) USDA accorded Moore any required opportunity to correct infractions at the stockyard before suffering a SASS suspension. *Moore v. Madigan,* 789 F.Supp. 1479, 1485 (W.D.Mo.1992). While the court upheld USDA's decision that Moore violated the Agreement, the court found that USDA's penalty was "unduly harsh" and reduced the SASS suspension from five years to six months. *Id.* at 1488.

## II. ANALYSIS

Only Moore appeals, so we do not reach the propriety of the district court's penalty reduction. Only some of the many issues that Moore raises on appeal merit explicit discussion.

### A. FACT-FINDING PROCEDURE

USDA advised Moore in a September 1989 letter that it planned to withdraw SASS from JRS, and that Moore could request an informal hearing if he disputed

---

1. USDA veterinarian James Massman testified that an animal's domicile for purposes of brucellosis classification is determined by the state where the animal last spent 120 days.

the factual basis for the withdrawal. With USDA's letter, Moore received rules that USDA adopted to govern the informal hearing procedure. Moore claims that he was entitled to a formal hearing before an administrative law judge, with a panoply of discovery and subpoena rights.

First, Moore argues that Congress accorded him a formal hearing. But when Congress mandates a formal hearing before an agency in a statute, it either employs the term of art "on the record" or it indicates its intent to trigger the formal hearing procedures of the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq. See City of West Chicago, Ill. v. United States Nuclear Regulatory Comm'n,* 701 F.2d 632, 641 (7th Cir.1983); *Webster Groves Trust Co. v. Saxon,* 370 F.2d 381, 384–386 (8th Cir.1966). USDA claims authority to establish its brucellosis eradication program under 21 U.S.C. § 111, which permits USDA to "make such regulations and take such measures as [the Secretary of Agriculture] may deem proper to prevent the introduction or dissemination of the contagion of any . . . communicable disease of animals. . . ." No statute refers to SASS or agreements with stockyard operators, let alone withdrawal proceedings; these are creatures of regulations that USDA promulgated pursuant to section 111. There being no evidence of congressional intent to provide a formal hearing for the withdrawal of SASS, the district court correctly dismissed this argument. *Moore,* 789 F.Supp. at 1485.

Next, Moore claims that USDA regulations require a formal hearing before SASS withdrawal. USDA cited the following regulation to Moore in advising him of his right to an informal hearing:

> Before [USDA] withdraws approval from a specifically approved stockyard based upon a failure to maintain or operate the stockyard in accordance with the standards specified in the agreement, the operator of the stockyard will be informed in writing of the reasons for the proposed withdrawal of approval and, upon request, shall be afforded an opportunity for a hearing with respect to the merits or validity of the action to withdraw approval if there is a dispute regarding any material fact, *in accordance with rules of practice which shall be adopted for the proceeding.*

9 C.F.R. § 78.44(b)(2) (emphasis added). USDA interprets this regulation to permit latitude in its selection of hearing procedure for SASS withdrawal. Moore argues that section 78.44(b)(2) must be read in conjunction with 7 C.F.R. § 1.131, where USDA guarantees a formal hearing under specific circumstances.[2] Proceedings to withdraw SASS are conspicuously absent from the detailed list in section 1.131. From this fact, we know that USDA possesses a convenient means to guarantee a formal hearing, and USDA has not done so for SASS-withdrawal proceedings. In "an administrative proceeding as to which Congress has not explicitly required any given type of procedure[, an agency may interpret its own regulations] within very broad limits." *City of St. Louis v. Department of Transportation,* 936 F.2d 1528, 1534–35 n. 1 (8th Cir.1991). Given our understanding of section 1.131, USDA's interpretation of section 78.44 is logical and reasonable. We thus agree with the district court that section 78.44 permits the informal hearing accorded Moore.

Finally, Moore cites *Air Transport Ass'n of America v. Department of Transportation,* 900 F.2d 369 (D.C.Cir.1990), *vacated on other grounds,* 498 U.S. 1077, 111 S.Ct. 944, 112 L.Ed.2d 1033 (1991), in support of his argument that USDA violated 5 U.S.C.

---

**2.** 7 C.F.R. § 1.131 states:
(a) The [formal] rules of practice in this subpart shall be applicable to all adjudicatory proceedings under the [following] statutory provisions[:]
. . . .
Act of February 2, 1903, commonly known as the Cattle Contagious Diseases Act of 1903, section 3, as amended (21 U.S.C. 122).

. . . .
(b)(2) Adjudicatory proceedings under the regulations promulgated under the Animal Quarantine and Related Laws (21 U.S.C. 111 *et seq.*) for the suspension or revocation of accreditation of veterinarians (9 CFR Parts 160, 161).

§ 553 by adopting informal hearing rules for his SASS withdrawal without first providing notice and an opportunity for public comment on those rules. But the *Air Transport* court took "no position on whether parties whose cases have reached a *final* determination under [procedural rules adopted without notice and comment] may now raise the procedural invalidity of the [r]ules as a ground for seeking review." *Id.* at 381.

■ USDA reached a final decision in this case after a complete hearing and before Moore raised any section 553 argument on the record. Based on our understanding of the record, we hold that Moore is not entitled to any relief even if USDA adopted informal hearing rules in contravention of section 553. As long as we "'act within the bounds of the statute [granting us authority to review an agency decision] and without intruding upon the administrative province, [we] may adjust [our] relief to the exigencies of the case in accordance with the equitable principles governing judicial action.'" *Komatz Constr., Inc. v. NLRB*, 458 F.2d 317, 325 (8th Cir.1972) (quoting *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373, 59 S.Ct. 301, 307, 83 L.Ed. 221 (1939)); *see also United States Steel Corp. v. EPA*, 649 F.2d 572, 576 (8th Cir.1981); *Air Transport*, 900 F.2d at 380 (applying *Ford Motor Co.* outside NLRB context).

Had Moore made a record objection based on section 553 before the hearing, USDA could have considered the merits and decided whether to continue with the hearing at that time. If we now remand for any section 553 violation, USDA will have wasted its hearing resources for a reason that USDA had no cause to consider before Moore's informal hearing, and Moore will receive a second hearing, *with attendant delays*, as a reward for failing to present his full case to USDA. The futility of a second hearing further convinces us that the district court properly refused to consider Moore's section 553 argument. Even if we consider the post-hearing affidavits that Moore submitted to the

district court,[3] the record contains nothing to refute the sanitation and identification violations found by USDA. Under these circumstances, the district court did not err in refusing to grant relief based on Moore's section 553 claim.

## B. SECOND CHANCE

■ With exceptions that do not apply here, the APA requires agencies to provide regulated entities with notice and an opportunity to achieve compliance with regulations before withdrawing *or* suspending any license. 5 U.S.C. § 558(c). Assuming *arguendo* that SASS and the Agreement together constitute a license within the scope of section 558(c), we consider whether USDA complied with this law before instituting proceedings to withdraw SASS from JRS.

Section 558(c) first requires "notice by the agency in writing of the facts or conduct which may warrant the action." On October 13, 1988, Dake signed a report stating that the stockyard did not meet USDA sanitation standards and that class B cattle were wrongly identified as class A animals. In Dake's affidavit, he asserts that he discussed this report with McDowell, a JRS manager. Nothing in the record contradicts Dake on this point. Thus, JRS received sufficient notice of violations under section 558(c)(1) before USDA conducted its May 1989 inspection.

Moore argues that USDA did not comply with the second requirement of section 558(c), that agencies provide an "opportunity to demonstrate or achieve compliance" before withdrawing or suspending SASS. USDA officials inspected the stockyard on both October 13, 1988 and May 18, 1989, and on both occasions they found substandard sanitation and class B cattle identified as class A animals. We agree with the district court that these undisputed facts are determinative of USDA's compliance with section 558(c)(2). *See Moore*, 789 F.Supp. at 1485.

Moore contends that affidavits of several individuals establish that Moore continu-

---

**3.** *Cf. Moore*, 789 F.Supp. at 1486 (refusing to consider additional evidence).

ously improved sanitation at the stockyard from the time JRS purchased it in 1986 to October 1989, when a USDA inspector found that the stockyard complied with USDA sanitation regulations. The district court so found, and the record supports this finding. *See id.* at 1488. Moore also argues that a Missouri inspector's affidavit establishes that the stockyards were sanitary shortly after that inspector filed the adverse USDA report of October 13, 1988. But these facts do not abrogate the significance of findings by both the district court and USDA that the stockyard did not meet USDA sanitation requirements on October 13, 1988 or May 18, 1989. That USDA found the same violation on two *consecutive* inspection reports means that USDA complied with the second-chance requirement of section 558(c), at least as to sanitation.

As for the identification violations, Moore argues that he availed himself of his "opportunity to demonstrate or achieve compliance" with USDA identification regulations under section 558(c)(2), and therefore should suffer *no* license suspension. Moore explains that, after receiving the October 1988 inspection report, his commission company did not commit further identification violations. USDA's evidence at the informal hearing established that class B cattle were sold as class A animals at the stockyard on two occasions between the October 1988 inspection report and the May 1989. JLCC did not broker the sales on either occasion, but both the district court and USDA still held Moore responsible for the post-October 1988 identification violations.

The Agreement's language supports the decisions of the district court and USDA. Moore "agree[d] to maintain and operate [the stockyard] in accordance with each of the [Agreement's] provisions...." One of these provisions is that "[i]dentity of cattle from Class B States or areas shall be maintained...." Moreover, the Agreement stipulates that Moore "shall be the individual legally responsible for the day-to-day

operations of the specifically approved stockyard." *See* 9 C.F.R. §§ 78.44(a) n. 6 & 78.44(c).

Moore implies that he did all he could to control misidentification after the adverse October 1988 inspection report by posting a sign that read, "Joplin Regional Stockyards must absolutely have complete accurate address of owner." [4] But, especially after receiving notice in October 1988 that cattle had been misidentified and that this was a serious problem, Moore could (and should) have done more than post a sign. Tags on the ears and backs of cattle can indicate where the animal has been vaccinated or sold, and Moore could have hired someone at the commission companies' expense to compare the states indicated on these tags with the state-of-origin represented by the cattle sellers. This employee could ask further questions of the sellers if an animal's tags did not match the domicile state claimed by the seller. Besides instituting its own identification-assurance program, Moore could have evicted the independent commission companies or threatened them with disciplinary action if they sold class B cattle as class A animals. The agreement that each commission company executed with Moore gave Moore exactly this authority.

We agree with the district court and USDA that, after being warned in October 1988 that identification-assurance procedures were ineffective at the stockyard, Moore failed to correct the problems before a second adverse inspection report in May 1989. USDA complied with section 558(c).

### C. EVIDENCE OF PENALTY PROPRIETY

■ Moore argues that USDA failed to advise him of the penalty that it sought against him and failed to adduce evidence that supports even the six-month SASS suspension countenanced by the district court. Moore would have USDA inform stockyard operators before any hearing of the *length* of any SASS suspension sought, and pres-

---

**4.** Misidentification can easily occur if cattle owners bring their animals to the stockyard and either fail to indicate the state from which they

arrive or provide false address information to the commission companies.

ent evidence to justify any suspension. This evidence presumably would indicate the size of suspect stockyards, the effect of SASS suspension on communities that use suspect stockyards, and any aggravating or mitigating circumstances.

But Moore presents no authority that requires evidence of penalty propriety in this case.[5] Section 78.44 simply states that USDA may *withdraw* SASS upon finding that a stockyard operator has breached a section 78.44 agreement with USDA. Suspension is a lesser penalty than withdrawal; only withdrawal can connote permanence. USDA advised Moore several times before testimony began in the informal hearing that it sought to "withdraw" SASS from JRS. This was notice enough, and under section 78.44 as read in conjunction with section 558(c), USDA could impose this penalty upon establishing repeated breaches of the Agreement.

### III. CONCLUSION

Having considered all of Moore's arguments on appeal, we AFFIRM the district court's judgment.

---

**5.** Moore cites *Capital Produce Co. v. United States,* 930 F.2d 1077, 1080–81 (4th Cir.1991) (substantial record evidence did not support a willfulness finding, which was a necessary element of a violation of the Perishable Agricultural Commodities Act), *Ferguson v. USDA,* 911 F.2d 1273, 1277–79 (8th Cir.1990) (precedent establishes that willfulness is relevant to sanction severity under 7 U.S.C. § 204), *Hutto Stockyard, Inc. v. USDA,* 903 F.2d 299, 304–05 (4th Cir.1990) (suspension disallowed because USDA failed to comply with either the notice or the willfulness requirements of 5 U.S.C. § 558(c) before instituting license-removal proceedings), *Western States Cattle Co. v. USDA,* 880 F.2d 88, 91 (8th Cir.1989) (following *Farrow*), *Farrow v. USDA,* 760 F.2d 211, 216 (8th Cir.1985) (when USDA requires a showing that a "violation [is]

flagrant and serious" before the imposition of "severe" sanctions, severe sanctions will not be allowed absent evidence of a flagrant and serious violation), and *Bosma v. USDA,* 754 F.2d 804, 810 (9th Cir.1984) (enforcing 7 U.S.C. § 213(b), which requires consideration of specific factors in penalty determination). The court in each of these cases simply refused to sustain a sanction when a statute, agency decision, or precedent required proof of a certain element before the sanction could be imposed, and that proof was absent from the record. Consistent with these cases, USDA may impose the sanction specified by section 78.44 (withdraw SASS) upon establishing the elements specified by section 78.44 (breach of the Agreement).