# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1314

_____

| | | |
|---|---|---|
| Donald W. Wilson, | * | |
| | * | |
| Petitioner, | * | |
| | * | Petition for Review |
| v. | * | of an order of the Commodity |
| | * | Futures Trading Commission. |
| Commodity Futures Trading | * | |
| Commission, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted:  December 12, 2002

Filed:  March 11, 2003

_____

Before HANSEN, Chief Judge, and HEANEY and BYE, Circuit Judges.

_____

HEANEY, Circuit Judge.

Donald Wilson appeals the Commodity Futures Trading Commission's (the Commission) determination that he violated the Commodity Exchange Act (CEA or "Act") and the penalties imposed against him as a result of his misconduct. We affirm.

By initial decision issued July 21, 1999, an ALJ found that Wilson did not offer to enter into, enter into, or confirm wash trades in violation of § 4c(a)(A) of the CEA

as charged in the complaint, and dismissed the complaint in its entirety. By order issued September 29, 2000, the Commission vacated the initial decision and determined that Wilson had violated § 4c(a)(A) of the Act. Based on its review of the gravity of the violations, the Commission ordered that Wilson cease and desist from violating the Act as charged, and that his registration be suspended for six months. It then determined that a tentative civil monetary penalty of $25,000 be imposed against Wilson. Because some of the violations occurred prior to October 28, 1992, the Commission remanded the matter and directed the ALJ to determine whether the tentatively imposed civil monetary sanction against Wilson was appropriate, considering the provisions of § 6(d) of the CEA. The ALJ determined that § 6(d) does not require modification of the civil monetary penalty proposed by the Commission, and ordered that Wilson comply with the Commission's recommended sanctions. Wilson appeals.

I.    Background

Wilson filled twenty-two (or, eleven pairs of) intramarket wheat futures spread orders at the Minneapolis Grain Exchange (MGE) between August 26, 1992 and February 18, 1993. In 1997, four and a half years later, the Commission's Division of Enforcement charged Wilson and Alfred Piasio[1] with offering to enter, entering, or confirming wash sales. Wilson and Piasio denied any wrongdoing. Initially the case had six respondents: Merrill Lynch Futures, Inc., Mitsubishi Corporation, Country Hedging, Inc., Charles Soule, Piasio, and Wilson. Following a review of charges that the Division intended to bring against them, Merrill Lynch, Mitsubishi, Country Hedging, and Soule settled their cases on June 24, 1997. Piasio and Wilson refused to settle, and the Division filed complaints against them.

---

[1]Piasio's appeal was decided by the United States Court of Appeals for the Second Circuit. Piasio v. CFTC, 2003 WL 18519 (2d Cir. Dec. 31, 2002).

The spread orders at issue were entered in New York by Mitsubishi through its Merrill Lynch futures account. Kazushig Takao was manager of Mitsubishi's Foods Division during August and September 1992. Takao was succeeded by Takeski Momosaki, who served as manager in January and February 1993. Between them, Takao and Momosaki placed with Piasio the eleven sets of paired spread orders for Mitsubishi's futures account at issue.

Mitsubishi's accounting problem appeared in the summer of 1992, when it fell short of its budgeted profit objectives. In August 1992, Takao was advised by Mitsubishi's Tokyo office that, while the Foods Division had a loss in the first part of the fiscal year ending September 1992, the Division had profits in the futures markets in a later accounting period, and that the corporation needed to adjust its profits and losses between the two periods. To correct the problem, Mitsubishi sought to shift profits in its futures and cash trading program from the second half of its fiscal year (October-March) to the first half (April-September).

The profit-sharing strategy that Takao adopted took advantage of the broad discretion allowed traders in pricing the legs of a spread under Minneapolis Grain Exchange (MGE) Rule 2018. Takao decided to buy and sell the September/December wheat spread, but to price the legs of the spread so that he bought the September contract at the day's low and sold it at the day's high. This created a large apparent profit in the nearby leg, which was offset by a comparable loss in the more distant leg. Takao phoned Piasio, Mitsubishi's Merrill Lynch futures broker, and told him that in order to adjust profits and losses, he wanted to show a profit from Mitsubishi's futures trading in the nearby month, and explained how to price each spread transaction. Takao placed simultaneous orders to purchase and sell 500 September/December wheat spread positions. He was indifferent as to whether the purchase or sale was executed first, but he did specify that the result of the purchase and sale should not be a loss that exceeded one cent per bushel.

-3-

In January 1993, Mitsubishi sought to remedy a similar budgetary shortfall using the same type of transactions. After consulting Takao, Momosaki (the new manager of the Foods Division) spoke with Piasio by telephone and simultaneously placed paired orders to buy and sell 500 March/May wheat spread positions. He told Piasio that the result of the purchase and sale should not be a loss that exceeded 1/4 cent per bushel.

Merrill Lynch maintained an omnibus futures account with Country Hedging in Minneapolis. After receiving Mitsubishi's spread orders by phone in 1992 and 1993, Piasio phoned the orders to Country Hedging's MGE trading floor phone clerk, Charles Soule. Soule prepared separate but consecutively numbered Country Hedging floor orders reflecting Mitsubishi's instructions for the purchase and sale of the same quantity of wheat spread positions. The omnibus account number and the time stamped on the paired purchase and sale orders were the same. Having never received such pricing instructions before, Soule considered Piasio's instructions unusual. He repeated them back to Piasio to confirm, then subsequently walked the orders to the MGE pit and handed them to Wilson, a floor broker, for filling.

According to Wilson, transactions one through three lacked instructions regarding acceptable losses, while transactions four through eleven were accompanied by instructions to limit any loss to 1/4 cent per bushel. He considered the orders unusual because of the pricing instructions, which raised questions about his ability to fill them in compliance with MGE rules. After asking around about the propriety of the transactions, and without getting a clear or informed answer, Wilson relied upon Country Hedging to ensure that the orders were in compliance with exchange rules. Wilson acknowledged to MGE staff that after executing transactions one through three, he suspected that the trades were for the benefit of one customer.

Wilson bid and offered the spread within seconds of each other and did not believe that the traders who bought and sold opposite him in transaction four were at

risk. He apparently told MGE that if he did not execute the sets of paired orders simultaneously, he would have exposed himself to financial risk. It appears that the result for each participating trader was a guaranteed profit without the risk attendant on an unmatched position.

The results of the transaction are the following: because of the structure and execution of each of the eleven transactions, Mitsubishi began and ended each one with the same net position in the wheat spread market, but it was able to create the desired apparent profit in the nearby month. The actual financial result for Mitsubishi was a relatively small loss of $20,263.00.

II.    Discussion

A.    Wash Sales

The first issue before us is whether the Commission was clearly erroneous in concluding that Wilson knowingly participated in wash sales. The factual findings of the Commission are conclusive "if supported by the weight of the evidence." CEA § 6(c), 7 U.S.C. § 9; Maloley v. R.J. O'Brien & Assocs., 819 F.2d 1435, 1440 (8th Cir. 1987). The proper standard of review of the Commission's application of law to facts depends on the comparative qualifications and competencies of courts and agencies. Maloley, 819 F.2d at 1440-41. Where the issue involves the agency's specialized knowledge and Congress has vested the agency with discretion in a technical area, the courts should recognize the agency's presumed competence and expertise, and uphold the agency's conclusion if it is rationally based. Id. at 1441.

Wilson's principal challenge involves the Commission's interpretation of the CEA regarding the prohibition against wash sale transactions in § 4c(a)(A), 7 U.S.C. § 6c. Where the questions to be decided involve determinations within the competence and expertise of the agency, the more deferential standard of review

should apply.  Lile v. Univ. of Iowa Hosps. and Clinics, 886 F.2d 157, 160 (8ᵗʰ Cir. 1989).  The Commission's interpretation is to be given controlling weight unless it is "arbitrary, capricious, or manifestly contrary" to the CEA.  TeamBank, N.A. v. McClure, 279 F.3d 614, 618-19 (8ᵗʰ Cir. 2002) (quoting Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984)).

Section 4c(a) provides in pertinent part that:

> [I]t shall be unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity . . . if such transaction is, is of the character of, or is commonly known to the trade as a "wash sale," . . . or if such transaction is used to cause any price to be reported, registered, or recorded which is not a true and bona fide price.

7 U.S.C. § 6c(a).  Wash sales involve the use of techniques designed to give the appearance of submitting trades to the open market, while negating the risk or price competition incident to the market. Wash trading produces a virtual financial nullity because the resulting net financial position is near or equal to zero.  Such transactions are considered harmful because they create illusory price movements in the market.

To establish that a wash sale has occurred, the Division must initially demonstrate that the transaction at issue achieved a wash result.  There must be: (1) the purchase and sale (2) of the same delivery month of the same futures contract (3) at the same (or a similar) price.  In re Gilchrist, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶24, 993 at 37,653 (CFTC Jan. 25, 1991).  Other factors that indicate the occurrence of a wash sale include (1) the customer's intent to negate risk or price competition at the time the challenged transactions are initiated, In re Gimbel, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶24, 213 at 35,003 n.7 (CFTC Apr. 14, 1988); and (2) the participants' knowledge at the time they chose to

participate that the transaction was designed to achieve a wash result that negated risk, In re Collins, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶23,401 at 33,078 (CFTC Nov. 26, 1986).

The Commission concluded that Wilson knowingly participated in wash sales because the evidence sufficiently demonstrated that Wilson knew that the orders underlying transactions four through eleven were designed to negate risk. The Commission cited the following evidence to support its view: the structure of the orders put Wilson on notice that the customers expected a wash result designed to negate risk; he bid and offered the March-May spreads simultaneously; the traders who bought opposite Wilson on transactions four through eleven simultaneously sold the same quantity of spreads to him; Wilson suspected that the trades were for the benefit of one customer; Wilson feared financial risk if he had not executed the orders simultaneously; and he testified that he did not believe there would be any risk involved in the transactions because he bid and offered the spread within seconds of each other.

With regard to Wilson's contention that he was not a knowing participant in the wash sale because he relied on Country Hedging to tell him whether the orders were in compliance with the rules, the Commission determined that relying on the reputable brokerage house from which he received the orders is not an acceptable excuse for participating in wash sales. In so holding, the Commission relied on Three Eight, which explained that "[t]he fact that one of the parties upstream may have breached his duty to the marketplace does not excuse a floor broker's ignoring his own duty not to knowingly participate in wash sales." In re Three Eight Corp., [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,749 (CFTC June 16, 1993).[2] Furthermore, "a floor broker is responsible for evaluating the orders he

[2]Because the Commission adequately discussed and distinguished its prior decision in Three Eight, we reject Wilson's assertion that the Commission was bound

receives for indications that his participation in the transaction is legally prohibited." Id. The Commission concluded that Wilson's inquiry about the orders was not persuasive evidence that he had made a good faith effort to avoid participating in an improper transaction.

We believe that the Commission's findings are supported by the weight of the evidence, and affirm its conclusion that Wilson knowingly participated in wash sales.

B.    Sanctions

We next address the sanctions that the Commission imposed against Wilson. The Commission's choice of sanctions within statutory limits will be upheld in the absence of an abuse of discretion. Reddy v. CFTC, 191 F.3d 109, 123 (2d Cir. 1999); Vercillo v. CTFC, 147 F.3d 548, 552-53 (7th Cir. 1998); JCC, Inc. v. CFTC, 63 F.3d 1557, 1564-65 (11th Cir. 1995). An agency is entitled to substantial deference in assessing the sanctions appropriate for a violation of the statute and regulations it administers, unless its choice of sanctions is "unwarranted in law" or without justification in fact. Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 185-86 (1973); Valdak Corp. v. OSHA Review Comm'n, 73 F.3d 1466, 1470 (8th Cir. 1996).

The Commission imposed a cease and desist order on Wilson because it determined that he knowingly and repeatedly participated in wash sales, and that his offered excuses for his conduct were not credible. The Commission also imposed a six-month registration sanction and a civil monetary penalty on Wilson. We agree with the Commission that these sanctions are commensurate with the gravity of

---

to reach a different conclusion under the doctrine of *stare decisis*. See Chisholm v. Def. Logistics Agency, 656 F.2d 42, 47 (3rd Cir. 1981). Further, the Three Eight case supports the Commission's decision in this case.

Wilson's conduct, are not an abuse of discretion, and we therefore affirm this component of the Commission's order as well.

For the foregoing reasons, we affirm the Commission's final order that Wilson violated 4c(a)(A) of the CEA and the resulting imposed sanctions.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.