# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 08-3245

———————

Todd Syverson, doing business as     *
Syverson Livestock Brokers,       *
                        *
      Petitioner,           *
                        *   Petition for Review of an
    v.                   *   Order of the United States
                        *   Department of Agriculture.
United States Department of       *
Agriculture,                 *
                        *
      Respondent.         *

———————

Submitted: November 17, 2009
Filed: April 9, 2010 (corrected 4/12/10)

———————

Before RILEY,[1] Chief Judge, WOLLMAN, and SHEPHERD, Circuit Judges.

———————

WOLLMAN, Circuit Judge.

In this Packers and Stockyards Act case, see 7 U.S.C. §§ 181-229, Todd Syverson appeals from the judgment of the judicial officer of the United States Department of Agriculture. The judicial officer determined that Syverson had engaged in unfair and deceptive trade practices, in violation of 7 U.S.C. § 213(a), and failed to keep sufficient accounts, records and memorandum of his business, in

———————

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

violation of 7 U.S.C. § 221. The judicial officer determined that Syverson unfairly and deceptively overcharged a customer in a series of transactions in which he acted as a market agency and that he failed to produce documentation of his transactions in a timely manner. The judicial officer issued a cease and desist order to Syverson and suspended his registration under the Act for five years. We affirm the judicial officer's judgment in part, reverse in part, and remand to the judicial officer for reconsideration of the sanction.

I.

Syverson has bought and sold livestock since 1989, doing business as Syverson Livestock Brokers in Wanamingo, Minnesota. He is registered under the Packers and Stockyards Act (PSA) as both a market agency and a dealer. This dual registration means that he can traffic in livestock either as a market agency working on a commission basis, gleaning profit from the fees charged for arranging transactions, or as a dealer, deriving profit from the difference between his cost basis and sale price. In 2001, Syverson was ordered to cease and desist from "[i]ssuing accounts of purchase or sale which fail to show the true and correct nature of the livestock transaction accounted for therein" and "causing false records to be prepared." In re: Todd Syverson, P&S Docket No. D-99-0011, 2-3 (June 12, 2001).

In the spring of 2002, Syverson entered into an arrangement with Lance Quam, in which Quam sought to purchase approximately sixty cows during the coming summer.[2] Quam intended to breed the cows. Syverson agreed to provide the cows at

---

[2]In his reply brief, Syverson disputes this, stating that there was no testimony or evidence to this effect. Quam, however, testified that he told Syverson that he sought "approximately fifty or sixty" cattle "by late summer."

his purchase price, plus a commission of $15, and additional expenses, including trucking.[3]

During the summer of 2002, Syverson purchased cattle at the Zumbrota Livestock Auction in Zumbrota, Minnesota. The auction sold different types of cattle on different days of the week. The Monday auction included a variety of cattle, including open (not pregnant) cows, feeder cattle, calves, market cattle, fat cattle, and dairy cows being sold for slaughter. Typically, although not always, cattle sold at the Monday auction were sold for slaughter and priced by the pound. The Monday auction is colloquially known as the slaughter or cull auction, and most cattle sold at this auction are slaughtered shortly thereafter. Cattle sold at the Monday auction are given a four-digit identification tag, commonly known as a slaughter tag.

On Tuesdays, dairy cows are auctioned. Cows sold at the dairy auction are generally bound for dairy farms and priced by the head rather than by weight. Compared to the cattle sold at the Monday slaughter auction, cows sold on Tuesday tend to be of higher quality and are typically more expensive. In order to be sold at the Tuesday auction, a cow must have received a veterinary inspection that evaluates the overall health of the cow and the state of the udders. The cow must also be tested for brucellosis and tuberculosis. A cow that passes the veterinary inspection can be given a three-digit identification tag, marking it as suitable for the Tuesday dairy

---

[3]Beyond these facts, Syverson and Quam gave conflicting testimony concerning the agreement they reached. The administrative law judge and the judicial officer found both Syverson and Quam lacking in credibility. The judicial officer, therefore, relied upon the testimony of unbiased witnesses, relevant exhibits, and the other filings in the record. Our review is limited to the evidence upon which the judicial officer relied. See Corona Livestock Auction, Inc., v. U.S. Dep't of Agric., 607 F.2d 811, 814 n.8 (9th Cir. 1979). Review for substantial evidence neither includes the revisiting of credibility determinations, nor the re-weighing of evidence and the inferences to be drawn therefrom. Id.; Aikins v. United States, 282 F.2d 53, 57 (10th Cir. 1960).

auction. Importantly, a cow that has already received a four-digit slaughter tag can have its slaughter tag replaced with a three-digit dairy auction tag if it passes a veterinary inspection.

At both auctions, an individual that puts cattle up for sale is known as the consigner, as they have consigned their cattle to the auction for sale. The consigner remains the owner of the cattle during the auction and bears the risk that the cattle may die while at auction. Ownership is transferred when a successful bid is made for the cattle. If the consigner does not feel the bidding is at a fair price, then he may either (1) stop the bidding and withdraw his cattle from the auction at no charge (known as a "no-sale") or (2) repurchase the cattle from his own consignment, incurring auction fees.

On at least eight occasions during the summer of 2002, Syverson bought cattle at the Monday slaughter auction, had the cattle inspected by a veterinarian, re-tagged for the dairy auction, and then consigned for sale the next day in the Tuesday dairy auction. Syverson repurchased the cows from his own consignment and paid auctioneering fees of approximately twenty to twenty-five dollars per head. Syverson then delivered some of these repurchased cows to Quam, accompanied by an invoice that showed the Tuesday dairy auction price, a commission of $15, a veterinary fee, and the cost of trucking.[4]

---

[4]Of the sixty-two cows that Quam purchased in the summer of 2002, at least forty-four were repurchased from Syverson's own consignment. Only twenty-four cows are the subject of this case. These twenty-four traceable cows were all separately penned and invoiced to "Order 2" for Quam at the Tuesday auction. William Arce, a senior marketing specialist for the Grain Inspection, Packers and Stockyards Administration, testified that Syverson's failure to produce complete records prevented tracing the history of the rest of the cows.

To understand these transactions, it is useful to consider an example. At the Monday slaughter auction on August 19, 2002, Syverson bought a cow weighing 790 pounds, at a price of $30 per hundredweight, for a total purchase price of $237. The cow's four digit slaughter tag was #T4827. After passing a veterinarian examination that evening, the cow was re-tagged #565 for the Tuesday dairy auction.

At the Tuesday dairy cow auction the following day, Syverson consigned cow #565 to the auction and then repurchased the same cow from his own consignment for $475. Syverson had the auction segregate the cow into its own pen and invoice the cow as "Order 2" for Quam. The cow was then taken to a veterinarian for various shots and delivered to Quam later that day. For this cow, Syverson invoiced Quam $515.50, which included $475 for Syverson's purchase price, a $15 commission, a $15.50 veterinary fee, and $10 for trucking. With the invoice, Syverson included his Tuesday dairy auction receipt, representing that he had paid $475 for the cow. Syverson did not disclose that he had repurchased the cow from his own consignment or that the cow had been initially purchased at the Monday slaughter auction. As a result, the total amount invoiced to Quam was $278.50 greater than the amount Syverson paid for the cow at the Monday slaughter auction.

In February 2003, Quam received eight cows from Syverson. The trucker making the delivery, Jim Klecker, said to Quam, "Oh, you're the one," and then related rumors circulating at the Zumbrota auction, "that Todd [Syverson] was buying these cattle on Monday and turning around and running them up on Tuesday and selling them to somebody and they didn't know who." Klecker reported that he had spoken to Syverson about this rumor and that Syverson had responded, "Well, just keep it quiet about who we tell about where we got cattle there. Nobody else needs to know."

Acting on this information, Quam acquired veterinary records from the Zumbrota auction. The records showed that Syverson had been repurchasing dairy

cows from the Tuesday dairy auction that he had initially purchased at the Monday slaughter auction, confirming what Klecker had said. On May 8, 2003, Quam complained to the Grain Inspection, Packers and Stockyard Administration (GIPSA) about his dealings with Syverson. Robert Merritt, the Minnesota resident agent for GIPSA, commenced an investigation. GIPSA requested that Syverson produce for inspection his business records for 2002. Syverson did not turn over records of his business with Quam, stating that he had lost the records during a move. Although Syverson turned over other records, the records of transactions with Quam were missing. After speaking with his lawyer, Syverson produced some records of his business with Quam, claiming that they had been misfiled. These records, however, did not include the initial price or source of the cows that were supplied to Quam.

On December 14, 2004, GIPSA filed a formal complaint against Syverson, alleging that his self-dealing violated 7 U.S.C. § 213(a) as an unfair or deceptive practice and that his failure to keep proper business records violated 7 U.S.C. § 221. GIPSA's complaint sought a cease and desist order, a fine, and suspension of Syverson's registration under the PSA.

An administrative law judge (ALJ) held a two-day hearing on April 4-5, 2006. The ALJ issued her decision on August 31, 2007, concluding that Syverson, acting as a dealer under the PSA, had violated 7 U.S.C. § 213(a) by engaging in a deceptive and unfair practice, and had violated 7 U.S.C. § 221 for his failure to produce his business records for inspection. In re: Todd Syverson, P&S Docket No. D-05-0005, 2007 WL 3170335 (Aug. 31, 2007) (Syverson I). The ALJ found that Syverson had intentionally withheld the invoices that he had sent to Quam. The ALJ assessed a civil penalty of $5,000 and ordered Syverson to cease and desist from similar violations of the PSA.

On September 27, 2007, GIPSA appealed the ALJ's decision to the judicial officer. GIPSA argued that Syverson had acted as a market agency, not as a dealer,

and that his violations were serious violations of the PSA. GIPSA emphasized that Syverson had been ordered in 2001 to cease and desist from misrepresenting important facts about livestock purchases and sales to his customers. According to GIPSA, a five-year suspension was warranted. Syverson denied that he had violated the PSA and argued that no sanction should be imposed.

The judicial officer issued his final decision on August 27, 2008. In re: Todd Syverson, P&S Docket No. D-05-0005, 2008 WL 4105809 (Aug. 27, 2008) (Syverson II). He concluded that Syverson had acted as a market agency. In reaching this conclusion, the judicial officer considered a number of factors: (1) Syverson had charged Quam what appeared to be a "commission" of $15 per head; (2) there was a pre-existing agreement between Syverson and Quam for the purchase of cattle; (3) Syverson listed each expense that he incurred on his invoice (i.e. veterinary and trucking fees), rather than providing a comprehensive price; (4) Syverson communicated his cost basis to Quam, a practice that dealers tend to avoid; (5) Syverson presented an invoice to Quam that not only showed his cost basis, but also showed from whom Syverson had purchased the cattle, a practice required of market agencies, not dealers; (6) and on at least one occasion, Syverson segregated the cattle that he repurchased at the Tuesday dairy auction into an order lot for Quam, suggesting that Syverson had repurchased the cattle specifically for Quam, rather than merely to fill his own inventory. The judicial officer stated that although none of these factors alone was dispositive, the great weight of the evidence led him to conclude that Syverson was acting as a market agency.

Accordingly, the judicial officer determined that Syverson had violated 7 U.S.C. § 213(a) by engaging in unfair and deceptive practices and that his violations were "most serious." The judicial officer ordered Syverson to cease and desist from similar practices and from failing to produce his records for inspection. Beginning his discussion of whether a suspension was appropriate, the judicial officer recited the Secretary of Agriculture's sanction policy:

[T]he sanction in each case will be determined by examining the nature of the violations in relation to the remedial purposes of the regulatory statute involved, along with all relevant circumstances, always giving appropriate weight to the recommendations of the administrative officials charged with the responsibility for achieving the congressional purpose.

In re: S.S. Farms Linn County, Inc., 50 Agric. Dec. 476, 497 (1991). Applying this policy, the judicial officer stated that the administrators of the PSA had recommended a five-year suspension. He noted that the purpose of an administrative sanction is to deter future violations, that the case involved serious violations of the PSA, and that Syverson had not been deterred by a prior cease and desist order. The judicial officer then concluded that a five-year suspension was warranted. On September 26, 2008, Syverson timely filed this appeal, and the judicial officer stayed his order pending our review of his decision. The Secretary of the Department of Agriculture argues for affirmation of the judicial officer's decision.

II.

We review *de novo* the judicial officer's conclusions of law. 5 U.S.C. § 706; Rice v. Wilcox, 630 F.2d 586, 589 (8th Cir. 1980). Great deference, however, is accorded to the judicial officer's construction of the PSA, given that he is charged with enforcing it. Van Wyk v. Bergland, 570 F.2d 701, 705 (8th Cir. 1978) (citing Griggs v. Duke Power Co., 401 U.S. 424, 433-34 (1971)).

The factual findings of the judicial officer will be sustained if they are supported by substantial evidence. 5 U.S.C. § 706(2)(E); W. States Cattle Co. v. U. S. Dep't of Agric., 880 F.2d 88, 89 (8th Cir. 1989). Substantial evidence is a deferential review standard, requiring only the presence of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." W. States Cattle Co., 880 F.2d at 89 (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S.

197, 217 (1938)). Evidence may be substantial even when two inconsistent conclusions might have been drawn from it. W. Iowa Farms Co. v. United States, 629 F.2d 502, 505 (8th Cir. 1980). This standard applies with equal force when the judicial officer has reached a conclusion different from that reached by the administrative law judge. Farrow v. U.S. Dep't of Agric., 760 F.2d 211, 213 (8th Cir. 1985). We may not substitute our judgment for that of the judicial officer's as to what may be inferred from the evidence. Lewis v. Butz, 512 F.2d 681, 683 (8th Cir. 1975).

We review the judicial officer's imposition of sanctions for abuse of discretion. Ferguson v. U.S. Dep't of Agric., 911 F.2d 1273, 1278 (8th Cir. 1990) (quoting Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 188 (1973)). The judicial officer abuses his discretion when the sanction imposed is unwarranted in law or without justification in fact. Id.; Conforti v. United States, 74 F.3d 838, 842 (8th Cir. 1996).

A.

Syverson argues that the judicial officer erred in concluding that he was acting as a market agency when selling cattle to Quam. The PSA defines a market agency as "any person engaged in the business of (1) buying or selling in commerce livestock on a commission basis or (2) furnishing stockyard services." 7 U.S.C. § 201(c). Under the Act, a dealer is "any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser." 7 U.S.C. § 201(d). The distinction between a market agency and a dealer is critical to the administration of the PSA: a market agency owes a fiduciary duty to his customer and is held to a higher standard of conduct than a dealer. United States v. Donahue Bros., 59 F.2d 1019, 1022 (8th Cir. 1932). See generally Stafford v. Wallace, 258 U.S. 495, 513-17 (1921) (explaining the construction and purposes of the PSA).

The appearance of the word "commission" on an invoice is not dispositive. Ferguson, 911 F.2d at 1278. Rather, the nature of the business relationship is determinative of whether a registrant acted as a market agency or a dealer. Id. at 1279. To flesh out the nature of the relationship, we have found relevant: (1) whether the invoices of the registrant led customers to believe they consisted of the actual purchase price plus transactional fees; (2) whether the registrant made representations to customers that his only profit was the transactional fees; (3) whether the registrant told customers that he was acting as a market agency; (4) whether the registrant purchased cattle with a specific customer in mind; (5) whether the registrant made adjustments to the price of cattle in light of quality concerns. Id. at 1279-82. While all of these factors are relevant, none are conclusive. Id. at 1282.

The question before us is whether there was substantial evidence supporting the judicial officer's determination that Syverson was acting as a market agency, that is selling on a "commission basis." 7 U.S.C. § 201(c); W. States Cattle Co., 880 F.2d at 89. Review for substantial evidence does not require that we agree with the judicial officer, but merely that we find his determination to be a reasonable one. W. States Cattle Co., 880 F.2d at 89. Given the totality of the evidence, we conclude that it was.

Syverson provided Quam with invoices that included a commission of $15 per head, and those invoices made it seem as though the price was Syverson's cost plus transactional fees. Syverson's words and actions represented that his profit was gleaned from the transactional fees, not from the difference in his cost basis and the sale price. The invoicing system that Syverson used was typical of a market agency: dealers tend to refrain from displaying their cost basis; and market agencies, unlike dealers, are required to attach invoices showing their cost basis and the origin of the animal. Syverson conformed to the invoicing requirements of a market agency, displayed his cost basis, and itemized his expenses as a market agency typically would. There was evidence that Syverson segregated cattle at the auction into specific

-10-

order lots for Quam. While none of these factors alone would be sufficient, the totality is substantial evidence that Syverson was acting as a market agency.

Syverson disagrees and contends that the record is virtually devoid of evidence that he was acting as a market agency. First, he argues that the judicial officer did not give proper deference to the administrative law judge's contrary finding that he was acting as a dealer. We do not agree, for as we have previously said, the judicial officer may substitute his judgment for that of the administrative law judge. Farrow, 760 F.2d at 213.

Second, Syverson states the following factors weigh against a finding of market agency: (1) he claims that the $15 per head "commission" was not in fact a commission, but rather a "flat fee" (Syverson testified that the word "commission" on his invoices was inadvertent, and a remnant of another invoice that he had copied); (2) he emphasizes that he took title to the cattle before transferring them to Quam, shouldering the risk of loss until delivery; (3) Syverson claims that Quam did not have to buy and take delivery of any of the cattle; and (4) he argues that conversations he had with Quam lacked specificity as to time-frame and quantity and thus could not have constituted an agreement between a market agency and a buyer.

The word "commission" on an invoice is not dispositive of status as a market agency, but it is relevant to determining whether a registrant acted as a market agency. Ferguson, 911 F.2d at 1273. The commission charged in this case, $15 per head, was not extraordinary. See, e.g., H-W-H Cattle Co. v. Schroeder, 767 F.2d 437, 440 (8th Cir. 1985) (commission of $.35 per hundredweight); In re: Mark V. Porter, 47 Agric. Dec. 656, 660-63 (1988) (commission of $2 or $3 per head, or $.50 per hundredweight). We see no reason to consider it anything but a commission, as it was labeled on the invoice.

It is true that Syverson took title to the cattle before selling them to Quam, instead of brokering a transaction between another seller and Quam. This fact, however, is not particularly helpful to Syverson. The nature of the scheme required Syverson to take title to the cattle, repurchase them from his own consignment, and deliver them to Quam. A registrant cannot defeat a finding of market agency by taking title at some point in the transaction. See In re: Sterling Colo. Beef Co., 39 Agric. Dec. 184, 221 (1980) ("Who pays for the livestock is immaterial under the definitions of dealer and market agency in the Act."). The importance of taking title depends on whether title was taken for legitimate purposes, that is, whether the registrant purchased cattle for himself as a dealer and then separately sought buyers for this cattle. See Ferguson, 911 F.2d at 1281. When taking title is part and parcel of a deceptive scheme, it does not dispose of the question whether the registrant was acting as a market agency. Although Syverson and Quam may not have had an iron-clad agreement that specified the quantity of cattle to be delivered at a certain point in time, this fact is not dispositive. Nor is it conclusive that Quam could have, according to Syverson, backed out of the transactions.

Third, Syverson contends that the judicial officer's determination was in error in light of In re: Embry Livestock, Co., 48 Agric. Dec. 972 (1989), a case involving an extended discussion of whether a company was acting as a market agency or as a dealer. Syverson argues that under Embry the dispositive factor in determining status as a market agency or dealer is whether the registrant was working as an agent of the buyer. The statute defines a dealer as someone buying or selling "on his own account or as the employee or agent of the vendor or purchaser." 7 U.S.C. § 201(d). The statute defines a market agency as "any person engaged in the business of (1) buying or selling in commerce livestock on a commission basis or (2) furnishing stockyard services." 7 U.S.C. § 201(c). As the statute instructs, the central question is whether Syverson was working on a commission basis, that is, purporting to garner profit from the fee he charged for arranging the transactions. Moreover, in Embry, the company in question "took numerous steps" to insure that its customers knew that it was acting

as a dealer, including changing its billing procedures, business sign, and specifically notifying customers of this change. Embry, 48 Agric. Dec. at 981. Syverson took no such steps, and thus Embry is inapposite.

There was substantial evidence that Syverson was acting as a market agency. Although we consider a variety of facts to shed light on the nature of the business relationship, the question to be answered remains whether Syverson was, in fact, selling to Quam on a commission basis. 7 U.S.C. 201(c)(1); Ferguson, 911 F.2d at 1278. Selling on a commission basis means purporting to profit from facilitating the transaction—not from the difference between cost and sales price. This is precisely what Syverson appeared to do. Accordingly, the judicial officer's determination that Syverson acted as a market agency was well supported by substantial evidence, and we will not disturb it.

## B.

Because Syverson acted as a market agency, he owed a fiduciary duty to Quam. Donahue Bros., 59 F.2d at 1022. Syverson's failure to disclose that he had repurchased cattle from his own consignment was a conflict of interest, an unfair and deceptive practice, and a violation of 7 U.S.C. § 213(a). Donahue Bros., 59 F.2d at 1022-23 ("The act specifically forbids unfair, unjust, unreasonable, or deceptive practices or devices by market agencies in connection with the marketing of live stock or the performance of stockyard services."); Embry, 48 Agric. Dec. at 973; In re: Mark V. Porter, 47 Agric. Dec. at 668-69; In re: Harry Vealey, Jr., 39 Agric. Dec. 8, 13 (1979).[5]

_____

[5]The judicial officer determined that, as a matter of law, Syverson's deceptive and unfair practices violated § 213(a) even if he was acting as a dealer. Giving deference to the judicial officer's construction of the PSA, Van Wyk, 570 F.2d at 705, we would most likely agree.

-13-

Without conceding that he violated the Act, Syverson argues that the Administrative Procedures Act (APA), 5 U.S.C. § 558(c), precludes his suspension as a registrant because § 558(c) prohibits administrative suspension without prior notice by the agency or willful violation. He contends that he neither had notice that his conduct was unlawful, nor did he willfully violate the PSA. Syverson also argues that a five-year suspension is unwarranted in law and in fact and contends that it will put him out of business and force him into bankruptcy. The Secretary argues that Syverson's APA argument was waived and is without merit. The Secretary argues that a five-year suspension is warranted because of the severity of Syverson's violations and because he had been previously ordered to cease and desist from violating the PSA.

1.

Syverson's contention that his suspension would violate the APA, 5 U.S.C. 558(c), is raised for the first time on appeal. Generally, we will not consider claims that are first raised on appeal. Cole v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., 533 F.3d 932, 936 (8th Cir. 2008); see Excel Corp. v. U. S. Dep't of Agric., 397 F.3d 1285, 1297 (10th Cir. 2005). There is a narrow exception to this general rule for questions of law that must be addressed if "injustice might otherwise result." Hormel v. Helvering, 312 U.S. 552, 557 (1941) (describing an exceptional case when review is warranted); Cleland v. United States, 874 F.2d 517, 522 n.6 (8th Cir. 1989).

GIPSA argued to the judicial officer that a five-year suspension was appropriate in this case. Syverson had ample opportunity to argue that a suspension would violate the APA. Instead, he argued that a five year-suspension would be too severe given his supposed ignorance of the law. He neither cited § 558(c) nor made an argument similar to the one he makes here. Consequently, the judicial officer did not discuss whether a suspension would violate the APA, and thus we have no decision in that

-14-

regard to review. Syverson's violations were serious and a suspension in this case would not be a miscarriage of justice.[6] See United States v. South Dakota, 665 F.2d 837, 842 (8th Cir. 1981). Accordingly, Syverson's claim that a suspension would violate the APA, 5 U.S.C. § 558(c), is waived.

2.

Syverson argues that the judicial officer's sanction of a five-year suspension was an abuse of discretion.[7] He maintains that he did not intentionally violate the PSA and that a five-year suspension will bankrupt him and visit extreme hardship upon his family. The Secretary argues that a five-year suspension is warranted given that Syverson's violations were serious, his actions were deliberate and effective, and that

[6]We reject Syverson's argument that he could not have known that his practices were illegal. "[T]he act does not specify forbidden practices in detail," Donahue Bros., 59 F.2d at 1023, and prior disciplinary cases for price manipulation were sufficient to put Syverson on notice that his actions were unlawful. Coosemans Specialities, Inc., v. Dep't of Agric., 482 F.3d 560, 568 (D.C. Cir. 2007) (holding that prior disciplinary cases put registrant on notice); In re: Marvin J. Dinner & Kenneth S. Ross, 41 Agric. Dec. 2201 (1982) (disciplinary case involving similar scheme of price manipulation via repurchasing from own consignment). Syverson had already been subject to a cease and desist order for price manipulation. In re: Todd Syverson, P&S Docket No. D-99-0011 (June 12, 2001) (enjoining further issuance of "accounts of purchase or sale which fail to show the true and correct nature of the livestock transaction accounted for therein"). Moreover, his initial refusal to produce complete records of his dealings with Quam, which in and of itself was a willful violation, belies his claim that he did not know there was anything wrong with what he had done. We also reject Syverson's cursory argument that a suspension would deprive him of "due process."

[7]The judicial officer ordered that after suspension for one year Syverson could apply to the Packers and Stockyards Program to be the salaried employee of another registrant or packer.

-15-

he was previously ordered to cease and desist from deceptive business practices in violation of the PSA.[8]

We at times have taken a critical view of the judicial officer's sanctions, vacating much shorter suspensions as too severe. <u>Ferguson</u>, 911 F.2d at 1279 (six months' suspension); <u>W. States Cattle Co.</u>, 880 F.2d at 91 (same); <u>Farrow</u>, 760 F.2d at 216 (forty-five day suspension). A sanction that is too severe, given the nature of the conduct involved and the likely effect on the registrant, may be unwarranted in law and without justification in fact. <u>Ferguson</u>, 911 F.2d at 1282. A sanction may be without factual justification when the judicial officer fails to consider relevant facts, including, but not limited to, whether the conduct at issue undermined the governing statute, the entire context of the violation, the effect the sanction will have on the registrant, whether the sanction will put the registrant out of business, and mitigating circumstances. <u>Conforti</u>, 74 F.3d at 842; <u>ABL Produce Inc., v. U. S. Dep't of Agric.</u>, 25 F.3d 641, 646-47 (8th Cir. 1994); <u>Ferguson</u>, 911 F.2d at 1282-83. We have emphasized that the nature of the conduct in question is crucially important, as well as the effect of the proposed sanction on the registrant. <u>Ferguson</u>, 911 F.2d at 1282.

Following the Secretary's sanction policy, as set forth in <u>S. S. Farms Linn County</u>, the judicial officer was required (1) to examine the nature of the violations in relation to the remedial purposes of the PSA, (2) to consider all relevant circumstances, and (3) to give appropriate weight to the recommendations of the administrators of the PSA. 50 Agric. Dec. at 497. The judicial officer adequately dealt with the last factor, but did not address the first two.

The judicial officer was required, by his own rule, to consider the nature of the violations in relation to the remedial purposes of the PSA. <u>Id.</u> The PSA is not a

_____

[8]The ALJ determined that Syverson had not violated the prior cease and desist order from his previous disciplinary case for price manipulation. <u>Syverson I</u>, at *15.

criminal statute, but rather a regulatory scheme designed to protect those involved in the industry. See Donahue Bros., 59 F.2d at 1023. The goal of the statute is compliance, not retribution. The nature of Syverson's violations were that they involved price manipulation resulting in ill-gotten gain for him and economic harm to his customer. The remedial purposes of the PSA would be achieved by Syverson's continuing to do business in a fair and honest manner and complying with the PSA's record keeping requirements. A five-year suspension, if it permanently forces Syverson from the industry, appears to bear no relation to the remedial purposes of the PSA. The judicial officer did not address this relationship, and, without more, we are left only to speculate how Syverson's violations relate to the remedial purposes of the PSA.

Second, the judicial officer, again by his own rule, was required to consider all relevant circumstances. S. S. Farms Linn County, 50 Agric. Dec. at 497. Although we do not mean to blink at Syverson's violations, they were limited to one customer and involved a relatively small number of livestock. A five-year suspension would likely bankrupt Syverson and deprive him of his livelihood.[9] By not addressing these issues, the judicial officer did not consider all relevant circumstances.

The PSA authorizes the judicial officer to suspend a registrant "for a reasonable specified period." 7 U.S.C. § 204. Congress intended a "broad grant" of discretion to the judicial officer, and uniformity in sanctions is not required by the statute. Butz,

---

[9]The judicial officer took note of the size of Syverson's business and did not find "that the assessment of a reasonable civil penalty would affect his ability to continue in business." Syverson II, at *9. This statement was in the context of determining whether a fine was appropriate in accordance with the requirements of 7 U.S.C. § 213(b) (mandating consideration of the gravity of the offense, the size of the business involved, and the effect of the penalty on the person's ability to continue in business). It appears to have had no bearing on the judicial officer's determination of whether a suspension was justified, and if so, what length of suspension was appropriate.

411 U.S. at 186-88. We, however, take note that other disciplinary cases for similar conduct resulted in significantly lesser suspensions. In re: Stanley Gildersleeve & William Eberle, P&S Docket No. 6848 (Apr. 28, 1988) (twenty-one day suspension for Gildersleeve and six months' suspension for Eberle); In re: Marvin J. Dinner & Kenneth S. Ross, 41 Agric. Dec. at 2203 (ninety-day suspension for Dinner); In re: Marvin J. Dinner & Kenneth S. Ross, 41 Agric. Dec. 2196, 2197 (1982) (ninety-day suspension for Ross). Although there are aggravating factors present here and uniformity in sanctions is not required, the extreme variance in suspensions is troubling.

We agree with the judicial officer that a suspension is appropriate because this case involves a serious violation of 7 U.S.C. § 213(a), as well as a violation of 7 U.S.C. § 221 that hindered the investigation. These serious offenses are deserving of a significant sanction, especially in light of the prior cease and desist order for price manipulation that had been imposed upon Syverson. A five-year suspension, however, is not a "reasonable specified period," given the judicial officer's deviation from the requirements of his own sanction policy and the facts of this case. It is unwarranted in law and without justification in fact. As such, it constituted an abuse of discretion and must be reconsidered.

III.

The judicial officer's determinations that Syverson acted as a market agency under the PSA and that he violated the PSA are affirmed. The sanction is vacated and the case is remanded to the judicial officer for reconsideration of the sanction.

_____