# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3118
_____

Dawson Farms

*Plaintiff - Appellant*

v.

Risk Management Agency

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of North Dakota - Fargo
_____

Submitted: May 17, 2012
Filed: November 7, 2012
_____

Before RILEY, Chief Judge, BYE and MELLOY, Circuit Judges.

MELLOY, Circuit Judge.

Dawson Farms (Dawson) challenges the Risk Management Agency's ("the RMA") denial of its crop-insurance claim alleging loss due to rot in stored potatoes. The RMA is a federal agency that serves as the reinsurer of Dawson's insurance policy. A final agency review affirmed the RMA's denial of Dawson's claim, finding that the insurance adjuster's sampling of the stored potatoes followed adequate sample

procedures. Dawson appealed the final agency decision to the district court,[1] which affirmed. We affirm the judgment of the district court.

I

Dawson is a commercial potato grower in North Dakota. In the fall of 2006, wet and rainy conditions endangered its potato harvest. Notwithstanding the poor conditions, Dawson was able to harvest 65,201.7 hundredweight of the potatoes and place them in storage.

On October 10, 2006, Dawson filed a notice of loss with its primary insurer, Rain & Hail, LLC, from which it purchased a multi-peril crop insurance policy. As reinsurer of this policy, RMA had the right to participate in the loss adjustment process for claims like Dawson's with the potential to exceed $500,000 in losses. Among other things, Dawson claimed a loss resulting from "tuber rot," which is a covered condition under the policy defined as "[a]ny soft, mushy, or leaky condition of potato tissue." The policy states that to trigger coverage, tuber rot must exist in 5% or more of Dawson's potato crop.[2] On October 11, Rain & Hail's adjusters visited the farm, but they did not take samples of the stored potatoes because they erroneously assumed any damage was from an earlier, uncovered frost. On October 16, the

---

[1] The Honorable Ralph R. Erickson, United States District Judge for the District of North Dakota.

[2] The policy also contains a "guarantee," which precludes indemnity payments if the harvest is above a certain amount. In this case, Dawson's harvest exceeded this guarantee, which would usually negate coverage. However, if a covered condition such as tuber rot occurs in a sufficient percentage of potatoes (8.2%), the insured may collect a percentage of that indemnity, even where the total harvest exceeds the guarantee. This percentage tops out at 10.1% rot; if that amount exists, the insured may collect the full amount of indemnity from the policy.

insurance adjusters returned with a supervisor and took samples of potatoes from unharvested fields, but again, they did not sample the stored potatoes.

On October 15, the insurance period for all perils ended. However, the agreement between Dawson and Rain & Hail included a Storage Coverage Endorsement, which extended coverage for some forms of not-immediately-apparent damage (including tuber rot) for sixty days after the insurance period. Under this clause, coverage for Dawson's claim of potato rot extended to December 9, 2006.

On December 5, John Bata, one of the Rain & Hail insurance adjusters, returned to sample stored potatoes. Bata began sampling immediately, even though Michael Stitzmann, a Dawson partner, had asked Bata to wait to begin sampling until Stitzmann arrived. In the presence of other Dawson employees, Bata collected 56.31 pounds of potatoes using the "zig-zag" method of sampling. Under this method, Bata zig-zagged across the stockpiled potatoes and collected a sample about every three paces. Bata later testified that the stockpiled potatoes were in piles about fifteen to twenty feet high and that he obtained his samples by reaching six or eight inches below the surface. After collecting his sample, Bata commented that he thought the potatoes looked good. Dawson claims that in response to this statement, Stitzmann disagreed, showed Bata potato juice flowing from culverts under the piles, characterized the flow as indicative of potato rot, and asked Bata to take another sample. RMA disputes that Stitzmann made this request for resampling, but in any event, resampling did not occur at that time.

The next day, December 6, Rain & Hail determined the results of its adjustment. Bata found 1.11 pounds, or 1.97% pink rot and 0.87 pounds or 1.55% "other soft rot," for a total rot of 3.52%. This percentage was below the 5% required to trigger insurance coverage under the policy, so Rain & Hail denied Dawson's claim. The insurance adjustment for Dawson's claim continued over the next several months, and on May 11, 2007, RMA issued a final denial. With regard to the stored potatoes,

RMA found that there was no coverage because there was not a sufficient percentage of the potato crop affected by rot. Dawson requested administrative review of this decision.[3]

In September and October of 2007, a National Appeals Division ("NAD") hearing officer conducted an evidentiary hearing on the insurance issues and found in favor of Dawson on all indemnity issues. The hearing officer found that the sample the adjuster took from the piles of stored potatoes was not representative, as required by the Northern Potato Loss Adjustment Standards Handbook. The hearing officer did not discuss Bata's sampling methodology, but rather based his conclusion largely on the testimony of Dr. Gary Secor, an expert in potato pathology and professor at North Dakota State University, who testified that "[a] substantial amount of soft rot had to occur in the storage facility to have potato juice running out of the culverts underneath the potato pile." The hearing officer also found that Stizmann had asked Bata to resample the potatoes, and that Bata had refused. On these facts the hearing officer concluded as follows:

> If an adjuster saw these signs occurring in a storage bin, I believe it would have been prudent to go back and examine what is actually happening in the storage bin.
>
> . . . .
>
> I believe this is where we can inject a little common sense to this case. Since the adjusters were already at Appellant's Warehouse when Partner 1 advised them of the problems with the potatoes in the south half of the Warehouse, the adjusters should have resampled the potatoes. Thus, the

---

[3]The RMA also found, with regard to unharvested potatoes, that damage was caused by frost, which was not a covered loss. Dawson requested review of this decision as well. A hearing officer agreed with Dawson as to this issue and reversed. RMA does not appeal that determination here.

Insurance Adjusters erred in not resampling Appellant's potatoes on December 5, 2006.

Following this decision, RMA requested Director Review, pursuant to 7 C.F.R. § 11.9(a). After reviewing the record, the deputy director reversed the hearing officer's finding. The deputy director first noted that the adjuster testified that he used the zig-zag method of sampling. The deputy director then addressed the testimony of Dawson's expert, who had opined that the sample could not have been representative. The deputy director concluded:

> Unlike [Bata], Appellant's expert did not personally examine the samples taken, nor did he personally observe the potatoes in the warehouse. Thus, I must weigh his testimony accordingly. In doing so, and after considering the balance of the evidence in the [case record], I do not find the pathologist's testimony proves, by a preponderance of the evidence, that Insurance Company's adjusters improperly gathered the samples. Nor am I convinced that the resulting Disease Diagnosis Reports were otherwise inaccurate. *Because I find insufficient evidence of error in Insurance Company's sampling of the stored potatoes in the South Warehouse on December 5, 2006, I find that Appellant has failed to show, by a preponderance of evidence, error in RMA's approval of Insurance Company's adjustments of that portion of Appellant's claim on the basis of those inspection results.*

(emphasis added). Both parties sought reconsideration of this opinion, and on August 7, 2008, the NAD Director issued a final decision denying both parties' requests. From this final decision, Dawson sought judicial review.

Both parties moved for summary judgment. Dawson argued the deputy director applied an incorrect standard of review and substituted its own findings for those of the hearing officer rather than merely reviewing the hearing officer's findings for substantial evidence. Dawson also argued there was not substantial evidence to support the final agency determination. Finally, Dawson argued it was entitled to

-5-

relief due to the insurers' failure to resample. The district court rejected these arguments and affirmed the final agency decision. Dawson appeals to our court.

II

"When reviewing the district court's opinion upholding the administrative agency's decision, this court must render an independent decision on the basis of the same administrative record as that before the district court." Mages v. Johanns, 431 F.3d 1132, 1139 (8th Cir. 2005) (internal quotation marks omitted). We will set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Dawson argues that the deputy director abused his discretion and acted arbitrarily and capriciously by applying the wrong standard of review, making findings of fact independent from those of the hearing officer rather then merely reviewing the hearing officer's findings for substantial evidence. We reject this argument.

The applicable regulation states that the deputy director must review the hearing officer's conclusions for "substantial evidence," examining "the agency record, the hearing record, the request for review, any responses submitted [to him by the parties], and such other arguments or information as my be accepted by the Director." 7 C.F.R. § 11.9(d)(1); see also 7 U.S.C. § 6998(b). Under this regulation, the deputy director must consider the hearing officer's decision, but may also look beyond facts the hearing officer explicitly found in his decision and examine the underlying record. Accordingly, our task is to determine whether the deputy director correctly reviewed the hearing officer's decision for substantial evidence, or whether his decision so departed from that standard of review that he acted arbitrarily or capriciously, or otherwise abused his discretion. See Downer v. United States By and Through USDA, 97 F.3d 999, 1002 (8th Cir. 1996) (noting that "[t]his narrow [standard of] review entails a searching and careful de novo review of the administrative record

presented to determine whether the decision was based on a consideration of the relevant factors . . . ." (internal quotation marks omitted)).

Dawson's argument is not without some support. As quoted above, the deputy director used language suggesting he had engaged in the process of finding facts. He stated, "I must weigh his testimony accordingly. . . . I do not find . . . . Nor am I convinced . . . ." The deputy director ultimately concluded, however, "I find insufficient evidence of error in Insurance Company's sampling of the stored potatoes in the South Warehouse on December 5, 2006 [because] Appellant has failed to show, by a preponderance of evidence, error in RMA's approval of Insurance Company's adjustments of that portion of Appellant's claim on the basis of those inspection results." The crux of the hearing officer's determination in this case was that the insurance adjuster had failed to obtain a representative sample and had breached a duty to resample. We believe that, in light of the nature of the hearing officer's finding under review, the deputy director's statements make it "reasonably . . . discern[able]" that the deputy director applied the correct legal standard and considered the record for the proper purpose of reviewing the hearing officer's decision for substantial evidence. See Gatewood v. Outlaw, 560 F.3d 843, 846 (8th Cir. 2009). We also believe that, to the extent the deputy director's determination was a rejection of the hearing officer's finding that the adjuster had a duty to resample, the issue under review was a question of law. As the district court correctly concluded, "The Director is not bound by a decision that held the insurance adjuster to a standard of the hearing officer's own creation." We find no abuse of discretion or arbitrary and capricious action by the deputy director.

In the alternative, Dawson argues the agency determination is not supported by substantial evidence. In this regard, the Administrative Procedure Act "standard of review is a narrow one and the court is not permitted to substitute its judgment for that of the agency." United States v. Massey, 380 F.3d 437, 440 (8th Cir. 2004). Further, "[w]here the issue involves the agency's specialized knowledge and Congress has

vested the agency with discretion in a technical area, the courts should recognize the agency's presumed competence and expertise, and uphold the agency's conclusion if it is rationally based." Wilson v. Commodity Futures Trading Comm'n, 322 F.3d 555, 559 (8th Cir. 2003). As courts of general jurisdiction, we are not trained to evaluate whether liquid flowing from a pile of stored potatoes is necessarily indicative of an amount of rot sufficient to qualify for coverage. Further, we are not empowered to determine in the first instance whether samples taken six to eight inches from the surface of a large and deep pile of stored potatoes are adequately representative. We ask only whether there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Valkering, USA, Inc. v. USDA, 48 F.3d 305, 307 (8th Cir. 1995) (internal quotation marks omitted).

Here, the record shows an insurance adjuster used a sampling technique that obviously gathered samples from across the pile, if not from various depths within the pile. An expert stated fluid flowing from beneath the pile was evidence of rot, and the samples, in fact, showed some rot. That expert, however, was not present when Bata sampled the pile, and Bata commented at the time that the potatoes looked good. It is not necessarily the case that the fluid was indicative of a greater degree of rot than was found in the samples, nor is it immediately apparent that the six-to-eight inch sampling depth was flawed. Further, the question the agency faced was whether the sample obtained was representative, not whether it was ideal.

The Loss Adjustment Manual Standards Handbook sets forth requirements for sampling crops for adjustment purposes, but leaves much to the discretion of the adjusters themselves, requiring only that the sample be "representative":

> The adjuster is responsible for taking enough samples to ensure that the combined samples will be representative of all production in the storage structure. For stored production, this is done by using a probe (may need an extension) or other various means to extract samples from various depths and areas of the storage structure.

USDA, <u>Loss Adjustment Manual (LAM) Standards Handbook</u> § 96.C.2. (2006). Although there may be more accurate methods of obtaining a representative sample, nothing about the present record shows that the adjuster's method in this case was so flawed as to empower our court to interfere with the agency determination or to make the agency determination irrational. <u>See</u> <u>Wilson</u>, 322 F.3d at 559 ("[T]he courts should recognize the agency's presumed competence and expertise, and uphold the agency's conclusion if it is rationally based."). Simply put, even if we have qualms with the adjustment process in this case, we lack the technical expertise to form judgments based on those qualms, and therefore must defer to the agency's rational decision.

We affirm the judgment of the district court.

BYE, Circuit Judge, dissenting.

I respectfully dissent. I believe the dispositive issue in this case is whether the deputy director applied the correct legal standard when reviewing the decision of the hearing officer.

The majority, relying on the portion of the deputy director's order in which he determined there was insufficient evidence of error in Bata's sampling of the potatoes, concludes it was reasonably discernible that the deputy director reviewed the decision of the hearing officer for substantial evidence. I disagree. The deputy director applied a mixture of de novo review and review for substantial evidence. It is also clear the deputy director incorrectly applied the substantial evidence standard. I would, therefore, remand this case for reconsideration under the correct legal standard.

The deputy director was required to review the hearing officer's decision to determine whether it was supported by substantial evidence. 7 C.F.R. § 11.9(d)(1). "Substantial evidence is a deferential review standard, requiring only the presence of

-9-

'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Syverson v. U.S. Dep't of Agric., 601 F.3d 793, 800 (8th Cir. 2010) (quoting W. States Cattle Co. v. U.S. Dep't of Agric., 880 F.2d 88, 89 (8th Cir. 1989)). "Evidence may be substantial even when two inconsistent conclusions might have been drawn from it." Syverson, 601 F.3d at 800.

On review for substantial evidence, the inquiry is whether the decision being reviewed is supported by substantial evidence, not whether substantial evidence supports a contrary theory. Harwood v. Apfel, 186 F.3d 1039, 1042 (8th Cir. 1999) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)). However, the deputy director began his review of the hearing officer's decision on this issue by concluding substantial evidence supported the RMA's position, a theory contrary to the decision of the hearing officer.

Further, instead of determining whether the hearing officer's factual findings were supported by substantial evidence, the deputy director then went on to make findings of fact de novo regarding the manner in which Bata had sampled the potatoes and whether the sampling had been in accord with procedure. He also weighed de novo the relative credibility of Dawson's expert witness and the disease diagnosis reports, finding the expert to be less credible because he had not personally viewed the potatoes at issue and, accordingly, finding the disease diagnosis reports to be more credible. As the majority correctly notes, the deputy director may look beyond the findings of fact explicitly made by the hearing officer and examine the underlying record. 7 C.F.R. § 11.9(d)(1). However, in doing so, the deputy director is to assess the underlying record to determine whether it supports the decision made by the hearing officer, id., not some contrary theory or the director's independent conclusion, see Harwood, 186 F.3d at 1042.

Finally, the deputy director reached the issue of whether Bata had correctly sampled Dawson's potatoes. As the majority noted, this is a legal issue on which the

deputy director was not bound by the decision of the hearing officer. However, the deputy director made his legal conclusion on the basis of findings of fact he had made de novo rather than on the factual findings made by the hearing officer after determining whether those findings of fact were supported by substantial evidence. Accordingly, I would hold the deputy director's decision was not in accordance with law. If, on review for substantial evidence, the reviewing agency officer may make a de novo legal conclusion upon facts found de novo, the deferential review for substantial evidence would accord no deference whatsoever.

Because I would remand the case to the deputy director for reconsideration under the correct legal standard, I would not reach the issue of whether the deputy director's decision is supported by substantial evidence.

I respectfully dissent.

_____